Edward J. MARNELL et al., Plaintiffs,

v.

UNITED PARCEL SERVICE OF AMER-
ICA, INC., a corporation et al.,
Defendants.

No. 42778.

United States District Court
N. D. California.

Oct. 31, 1966.

Broad, Busterud & Khourie, Michael N. Khourie, J. Stanley Pottinger, San Francisco, Cal., for plaintiffs.

Pillsbury, Madison & Sutro, John B. Bates, Allan N. Littman, John A. Sutro, Jr., San Francisco, Cal., for defendants; Bernard G. Segal, Irving R. Segal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is a private antitrust action brought by plaintiff pursuant to the provisions of the Clayton Act, §§ 4, 16, 38 Stat. 731, 737 (1914), 15 U.S.C. §§ 15, 26 (1964) against United Parcel Service of America, Inc., and United Parcel Service, Inc., (Ohio).

The case is before the Court upon a motion by defendants for (1) an amendment to this Court's order of April 27, 1966, (denying defendants' motion to dismiss) to provide that such order be without prejudice, (2) for a stay of this action until the Interstate Commerce Commission and the California Public Utilities Commission have, in the exercise of their primary jurisdiction, considered and ruled upon certain issues raised by the complaint involving defendants' rates, territory, operations, contracts and various decisions of said commissions, and (3) in the event this Court declines to issue a stay, for a certificate that the denial of defendants' motions to dismiss or for a stay involve controlling questions of law as to which there is a substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of this litigation, pursuant to the provisions of 28 U.S.C. § 1292(b).

On January 20, 1966, approximately a year and four months after the filing of plaintiff's complaint, defendants had filed a motion to dismiss this antitrust action on the ground that "the Court lacks jurisdiction of the purported charges of antitrust violations involved in this case." That motion to dismiss was denied on April 27, 1966.

Shortly thereafter, May 6, 1966, defendants filed the instant motion for a stay pending referral of six issues raised by the complaint to the regulatory agencies for their determination upon the ground that such agencies have "primary jurisdiction" over these issues.

Because defendants reiterate much of the argument previously urged in support of their earlier motion to dismiss, this memorandum will deal, not only with defendants' motion for a stay, but also with the motion to dismiss.

These motions are directed to the complaint. However, in a memorandum filed on December 20, 1965, by plaintiff (in opposition to an earlier protective discovery motion by defendants) plaintiff sets forth in greater detail than in the complaint the acts constituting its cause of action. Because both parties rely upon this memorandum in their briefs, the Court will decide the pending motions upon the allegations of plaintiff's complaint considered in the light of that memorandum.

The complaint is in substance and effect a charge of monopoly—attempted and achieved. It alleges that in July 1963, plaintiff commenced the business of delivering retail packages from retail department, clothing and specialty stores located in the San Francisco Bay Area to the homes of the customers of such retail stores and is now engaged therein; that defendant United Parcel Service of America, Inc., is the holding company and manager of approximately twenty-five wholly owned subsidiaries which have retail parcel delivery businesses in at least sixteen states and the District of Columbia; that United Parcel Service, Inc., (Ohio) [1] is one of said subsidiaries engaged in the business of delivering retail packages from retail department clothing and specialty stores located in California, including the San Francisco Bay Area, as well as in other states, including Ohio; that beginning in 1907 and continuing uninterrupted up to and including the date of this complaint, defendants and their predecessors have engaged in unlawful contracts, combinations, and conspiracies in restraint of trade and commerce and have monopolized, attempted to monopolize and conspired to monopolize the retail parcel de-

1. Unless otherwise indicated, the Court will refer to United Parcel Service of America, Inc., and/or its wholly owned subsidiaries as United Parcel Service or UPS.

livery market in violation of the Sherman Act, §§ 1, 2, 26 Stat. 209 (1890), as amended, 15 U.S.C. §§ 1, 2 (1964) and the Clayton Act, §§ 2, 3, 7, 38 Stat. 730, 731 (1914), as amended, 15 U.S.C. §§ 13, 14, 18 (1964). The complaint also alleges violations of the Federal Trade Commission Act, § 5, 38 Stat. 719 (1914), as amended, 15 U.S.C. § 45 (1964).

It is further alleged that the defendants engaged in the following specific acts for the purpose of destroying competition, attempting and conspiring to monopolize and monopolizing the retail parcel delivery market: (1) That defendants for a period extending over forty years and on a nationwide basis, including the San Francisco Bay Area, have purchased competitors and potential competitors and obtained covenants against competition in the course of some acquisitions, which covenants were not related to the legitimate protection of the business acquired; (2) that defendants have acquired in Northern California and nationally from other motor carriers covenants not to compete in defendants' retail parcel delivery line of business as well as agreements from said motor carriers not to oppose defendants' applications before various regulatory bodies; (3) that defendants have on a nationwide basis, including the San Francisco Bay Area, entered into, maintained and insisted upon as a condition for doing business long-term, exclusive-use contracts with retail stores; (4) that defendants have on a nationwide basis and wherever there was competition from other parcel carriers, induced large retail stores to enter into or renew said contracts with defendants at rates unjustifiably low as compared to rates charged small retail stores and rates charged in areas where it has established a monopoly; (5) that defendants have required retail stores to enter into said long-term exclusive-use contracts as a condition of obtaining defendants' ever-increasing area wide (including interstate) parcel delivery service; (6) that defendants have required retail stores, as a condition of obtaining any delivery service at all, to enter into such contracts covering all its package delivery needs, irrespective of the origin or destination of the package, so long as defendants served such areas; (7) that defendants, whenever they achieved a monopoly position within an area, charged every retailer in that area high and arbitrary rates for delivery service, thereby acquiring great wealth, which wealth was then gathered together by the parent corporation and used as a means to acquire monopolies in other areas as well as to maintain monopolies once achieved; (8) that defendants used its national "deep pocket" financial power to grant interest free loans to operating subsidiaries, to indemnify said subsidiaries against loss, to purchase competitors and to engage competitors in expensive unfounded litigation; (9) that defendants have filed actions against competitors to enforce unlawful covenants and have registered and pursued complaints in various regulatory bodies against competitors for "imaginary, nonexistent or insignificant" violations of the regulatory code or regulations; (10) that defendants have prevented competitors from competing for its customers by conducting investigations and reporting unfavorably to said customers about competitors without accurate knowledge; (11) that defendants have induced and conspired with their driver labor unions to threaten economic sanctions against plaintiff's customers and to urge such customers to use "other parcel delivery companies" than plaintiff's; (12) that defendants have conspired with driver labor unions to refuse to negotiate with plaintiff and other competitors except upon terms contained in defendants' labor contracts; and (13) that in 1953 defendants entered into the wholesale delivery business (as distinguished from its retail parcel delivery service which it had been conducting in Northern California since 1919) between various cities in its Northern California delivery area and between its Northern California delivery area and its Southern California delivery area and operated

said wholesale delivery business at a small profit or below cost in order to eliminate competition in the wholesale parcel delivery field and by operating their wholesale and retail parcel delivery services together, defendants have been able to reduce costs in their retail parcel delivery business and increase their area coverage, thereby reinforcing their retail parcel monopoly position.

As a result of these practices, plaintiff alleges, defendants have a virtual 100% monopoly of the department, clothing and speciality retail store delivery service in San Francisco, Oakland, Los Angeles and 18 other major cities. Plaintiff (who advises the Court that he is no longer in the retail parcel delivery business) claims damages in the amount of approximately $500,000.

The questions herein presented are such that it will be necessary for the Court to consider the regulatory schemes of both the Interstate Commerce Act and the California Public Utilities Code as related to and as actually applied to motor carriers like defendants.

Defendants have not supported their motions with any factual showing concerning the nature of their operations or concerning the regulation of their operations by these agencies except that in briefs filed with the Court on August 5, 1966, July 21, 1966, July 8, 1966, May 26, 1966 and May 6, 1966, pertaining to the instant motions, and in briefs filed on March 17, 1966, and January 21, 1966 pertaining to their motion to dismiss, defendants have provided the Court with information concerning their operations and the extent to which they have been regulated including citation of numerous orders and decisions of the regulatory agencies affecting them and others in the trucking industry.

■ This Court will, of course, take judicial notice of the provisions of both the Interstate Commerce Act and the California Public Utilities Code and of these various agency orders and decisions. Fed.R.Civ.P. 43(a); Cal.Code Civ.Proc. § 1875(3).

## THE ISSUE OF EXCLUSIVE JURISDICTION

We will take up first the contention made by defendants in support of their earlier motion to dismiss, i. e., that the matters complained of in the complaint are subject to the jurisdiction and regulatory authority of federal and state regulatory agencies under a pervasive scheme of regulation; that plaintiff's attempt to raise these issues via a private antitrust action "is a direct evasion of the jurisdiction and regulatory authority of the Public Utilities Commission of the State of California and the Interstate Commerce Commission" and constitutes an attempt "to subvert the regulatory program;" and, accordingly, this Court has been precluded from exercising jurisdiction herein in view of the "repugnance between the antitrust assertions of plaintiff and the regulatory policy."

As to the Interstate Commerce Commission, defendants argue that the Interstate Commerce Act, which regulates defendants' interstate operations, and the antitrust laws are repugnant as applied to the activities alleged in the complaint and that, therefore, these operations should be held as a matter of statutory construction to have been free from the antitrust laws and left to the regulatory power of the Interstate Commerce Commission.

As to the California Public Utilities Commission, which regulates defendants' intrastate operations, defendants argue that the activities alleged in the complaint have been carried on by direction of that state regulatory act and that, therefore, the antitrust laws are inapplicable under the rule of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) that the antitrust laws are not intended to inhibit state directed conduct.

*(1) Interstate Commerce Act vis-a-vis the Antitrust Laws*

■ Taking up first the claimed conflict between the Interstate Commerce Act and the antitrust laws, it is well set-

tled that "Regulated industries are not per se exempt from the Sherman Act." State of Georgia v. Pennsylvania R. R. Co., 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051 (1945). However, some federal regulatory statutes do provide express immunity from the antitrust laws for certain approved conduct. See, for example, Federal Aviation Act, 49 U.S.C. § 1384; Federal Communications Act, 47 U.S.C. §§ 221(a), 222(c) (1); Webb-Pomerene Act, 15 U.S.C. § 62; The Shipping Act of 1916, 46 U.S.C. § 814; The Bank Merger Act of 1966, 80 Stat. 7, Public Law 89–356; and the Interstate Commerce Act, 49 U.S.C. §§ 5(11), 5b, 22.

Section 5a (also known as the Reed-Bulwinkle Act) of the Interstate Commerce Act, 62 Stat. 472 (1948), 49 U.S.C. § 5b (1964), which is one of these express exemptions from the antitrust laws, was added to the Interstate Commerce Act to counteract the effect of the State of Georgia v. Pennsylvania R. R. Co., supra, decision. It provides that any carrier (including motor carrier) which is a party to an agreement relating to rates, fares, classifications, divisions, allowances, or charges between two or more carriers may apply to the Commission for approval of such agreement and if the agreement is approved, the parties thereto are "relieved from the operation of the antitrust laws with respect to the making of such agreement" and are relieved from the operation of the antitrust laws "with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission."

Another express exemption provision of the Interstate Commerce Act is Section 5(11), 24 Stat. 380 (1887), as amended, 49 U.S.C. § 5(11) (1964) which provides that any transaction approved by the Interstate Commerce Commission pursuant to the provisions of Section 5 of the Act "are relieved from the operation of the antitrust laws and of all other restraints * * *." Thus, unifications, mergers and acquisitions approved by

the Commission pursuant to Section 5(2) of the Act, 24 Stat. 390 (1887), as amended, 49 U.S.C. § 5(2) (1964) are expressly exempt from the antitrust laws by virtue of Section 5(11). See McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

In the instant case defendants make no claim that the conduct alleged in this suit falls within this or any of the express exemption provisions of the Interstate Commerce Act, 49 U.S.C. §§ 5(11), 5b, 22. Rather, it is defendants' claim that their exemption is implied since application of both laws to the matters alleged in the complaint would result in a repugnance between the antitrust laws and the regulatory policy.

A similar contention was made in Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 932, 86 S.Ct. 781, 15 L.Ed.2d 709, 851 (1966) wherein the Supreme Court, dealing with the Shipping Act of 1916 (which, like the Interstate Commerce Act, contains certain express but limited exemptions from the antitrust laws) rejected such a contention. The Court held that such an express provision (Section 15 of the Shipping Act of 1916, 39 Stat. 733, as amended, 46 U.S.C. § 814 (1964)) exempting certain approved rate-making activities strongly implies that unapproved rate-making activities were not intended by the Congress to be exempted from the antitrust laws, citing United States v. Borden Co., 308 U.S. 188, 201, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

Further, the Court held that the remaining provisions of the Shipping Act could not be construed as an implied repeal of all antitrust regulation of the shipping industry's rate-making activities, stating 383 U.S. at 217–218, 86 S.Ct. at 784:

"We recently said: 'Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions.' United States v. Philadelphia National Bank, 374 U.S. 321, 350–351, 83 S.Ct.

1715, 1734, 10 L.Ed.2d 915. We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry."

In United States v. Borden Co., supra, 308 U.S. at 198–199, 60 S.Ct. at 188, the Court said:

"It is not sufficient, as was said by Mr. Justice Story in Wood v. United States, 16 Pet. 342, 362, 363, 10 L.Ed. 987, 'to establish that subsequent laws cover some or even all the cases provided for by [the prior act]; for they may be merely affirmative, or cumulative, or auxiliary.' There must be 'a positive repugnancy between the provisions of the new law and those of the old; and even then the old law is repealed by implication only, pro tanto, to the extent of the repugnancy.' "

On no occasion has the Supreme Court held that a federal regulatory act has by implication completely displaced the antitrust laws. See State of Georgia v. Pennsylvania R. R. Co., supra, holding that the Interstate Commerce Act is no bar to an antitrust suit against a carrier; United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959), holding that the Federal Communications Act is no bar to an antitrust suit against TV and radio licensees; United States v. Borden Co., supra, holding that neither the Agricultural Adjustment Act nor the Capper-Volstead Act displaced the Sherman Act; People of State of California v. Federal Power Comm'n, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1959), holding that the Clayton Act was not displaced by the Natural Gas Act; United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), holding that the Bank Merger Act of 1960 does not confer immunity from § 7 of the Clayton Act; and Carnation Co. v. Pacific Westbound Conference, supra, holding that the Shipping Act of 1916 does not render the antitrust laws wholly inapplicable to the shipping industry.

While the Supreme Court has never held that the antitrust laws have by implication been completely displaced by a regulatory statute, the Court, has on two occasions, held that the antitrust laws could not be applied to the precise acts charged in the antitrust suit because of a repugnancy between the antitrust laws and the regulatory statutes governing these acts. See Keogh v. Chicago & No. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

These two cases are greatly relied upon by defendants herein. However, before discussing them, we should briefly summarize the regulatory scheme of the Interstate Commerce Act as it applies to interstate motor carriers in general and as it applies to defendants in particular.

It appears from the record herein that defendants operate as an interstate "common" or "certificate" carrier between the various states comprising the midwest; between these midwestern states and various southeastern states; between California and the states of Washington and Oregon; between California and portions of Idaho, Nevada and Arizona; and between various states in the area of the Atlantic seaboard from southern Maine to the Virginias.

Defendants also operate as an interstate "contract" or "permit" carrier, subject to the jurisdiction of the Interstate Commerce Commission, between states within the metropolitan areas of New York, Philadelphia, Pittsburgh and Cincinnati. Defendants do not carry on any interstate "contract" carrier service into or out of California.

The regulatory provisions of the Interstate Commerce Act applicable to this case are 49 U.S.C. §§ 301–327 (1964), known as Part II of the Act.

With respect to interstate "common" carrier operations, the Act provides that common carriers must obtain from the Commission a certificate of public convenience and necessity. 49 U.S.C. § 307 (1964). The Commission may attach to the certificate such reasonable terms, conditions and limitations as the public convenience and necessity may require. 49 U.S.C. § 308 (1964).

Common carriers are also required to file with the Commission all its rates, fares and charges for its common carrier service and are prohibited from deviating therefrom. 49 U.S.C. § 317 (1964). Changes in its interstate common carrier rates, fares, charges or practices affecting a rate, may be made only after notice of the proposed change. 49 U.S.C. § 317 (1964). Unless suspended, a proposed rate goes into effect 30 days after its filing with the Commission. However, the Commission is empowered to hold hearings concerning the lawfulness of such rate and suspend its operations. 49 U.S.C. § 316(g), (1964). After hearing, the Commission may, upon a finding that the proposed rate is unjust, unreasonable or unduly preferential, prescribe the lawful rate, fare or charge.

Common carriers are also required to provide safe and adequate service, equipment and facilities and are prohibited from charging unjust or unreasonable charges for services rendered. 49 U.S.C. § 316 (1964). The Commission is empowered, upon complaint or on its own initiative, to enter into a hearing concerning the lawfulness of any existing rate, fare or charge and, upon a finding that the said rate, fare or charge is unjust, unreasonable or unduly preferential, prescribe the lawful rate, fare or charge.

Concerning interstate "contract" carrier operations, the provisions of the Interstate Commerce Act are similar.

Contract carriers must obtain a permit from the Commission and the Commission is empowered to attach such reasonable terms, conditions and limitations to the permit as are consistent with the character of the permit holder. 49 U.S.C. § 309(b) (1964).

Contract carriers are also required to file with the Commission schedules of its actual rates or charges for its contract service and are prohibited from making any reduction in its rates or charges or establishing a new charge except after notice. 49 U.S.C. § 318 (1964). Unless suspended, the proposed reduction or new charge goes into effect 30 days after its filing with the Commission. The Commission may, however, enter upon a hearing concerning the lawfulness of such new or reduced charge and suspend its operation for a maximum of seven months. 49 U.S.C. § 318(c) (1964). After hearing, the Commission may, upon a finding that the proposed new or reduced charge contravenes the national transportation policy or is in contravention of Part II of the Interstate Commerce Act, prescribe a just and reasonable minimum rate or charge. 49 U.S.C. § 318(b) (1964). "Contract carriers", are also required to establish and observe reasonable minimum rates and charges. 49 U.S.C. § 318(a) (1964). The Commission is empowered, upon complaint or on its own initiative, to enter into a hearing concerning the lawfulness of any existing minimum rate or charge of a contract carrier and, upon a finding that such minimum rate or charge contravenes the national transportation policy or is in contravention of Part II of the Interstate Commerce Act, the Commission may prescribe a just and reasonable minimum rate or charge. 49 U.S.C. § 318(b) (1964). Contract carriers are also required to file with the Commission a true copy of every contract for the interstate transportation of property between it and the shippers it serves. 49 U.S.C. § 320 (1964). But, the Commission cannot make public such contract except in a formal proceeding where it considers such action consistent with the public interest.

The Commission may amend, suspend or revoke any certificate or permit for wilfull failure to comply with the provi-

sions of Part II of the Act, or with any lawful order, rule or regulation of the Commission or with any term, condition or limitation of the certificate or permit. 49 U.S.C. § 312 (1964).

The only .express requirement in the Interstate Commerce Act that the Commission consider possible antitrust effects is found in 49 U.S.C. § 5(2) (b) (1964) ("Proviso") which requires that before approving, and thereby exempting from the antitrust laws, an affiliation of a motor carrier with a railroad, the Commission must find, not only that such affiliation will be in the public interest, but also that it "will not unduly restrain competition." This provision, however, has no possible application to the pending case.

Another reference in the Act to the competitive factor is found in 49 U.S.C. § 5b (1964) (Reed-Bulwinkle amendment) which provides that before approving, and thereby exempting from the antitrust laws, an agreement between carriers relating to rates, fares, etc., the Commission must find that the exemption is in "furtherance of the national transportation policy declared in the Act, so that the agreement should be relieved from the operation of the antitrust laws with respect to the making and carrying out of such agreement." The national transportation policy referred to (Preamble to Part II of the Act) is to the effect that regulation of motor carriers shall be in "the public interest" and, further, among other things, that "destructive competitive practices" will be avoided.

As to other transactions, e. g., mergers, consolidations and acquisitions which the Commission, acting under Section 5(2) (b), may approve and thereby exempt from the antitrust laws, the statutory standard is only that the transaction "will be consistent with the public interest" after considering four factors (§ 5(2) (c)) none of which concern competition.

The purpose of specific exemptive provisions like the foregoing and the guidelines which the Commission should follow in carrying them out are well stated in such cases as McLean Trucking Co. v. United States, supra, and Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959).

Except as set forth in the three provisions above mentioned, and the special exemptive provisions of 49 U.S.C. § 22 (1964), (none of which provisions have any application to the pending case), there is no provision in the Interstate Commerce Act for exemption of carriers, motor carriers or otherwise, from the antitrust laws.

█ As stated in Carnation Co. v. Pacific Westbound Conference, supra, and United States v. Borden Co., supra, specific exemptive provisions like the foregoing strongly indicate that Congress did not intend to otherwise exempt the regulated industry from the antitrust laws.

█ The Court, therefore, should not by implication read further antitrust exemption into the Interstate Commerce Act unless it can be said that the remaining provisions of the Act, or the Act considered in its entirety, are so pervasive in their application or so deal with the essential ingredients of the pending case that the antitrust laws, if applied to the acts alleged in the complaint, would be plainly repugnant. With this in mind we will consider the remaining provisions of the regulatory scheme.

█ In issuing operating certificates to common carriers the Commission's standard is merely public convenience and necessity in accordance with the national transportation policy. 49 U.S.C. § 308 (1964). In issuing operating permits to contract carriers the standard is merely the ability of an applicant to perform contract carrier services and the consistency of the operation with the public interest and the national transportation policy. 49 U.S.C. § 309(b) (1964). However, such a standard governing Commission determination does not make the regulatory scheme

all pervasive so as to preempt the anti-trust laws.

■ As stated in People of State of California v. Federal Power Comm'n, supra, 369 U.S. at 485, 82 S.Ct. at 904 with respect to provisions of the Natural Gas Act [§ 7] requiring a certificate of convenience and necessity prior to acquiring the assets of a natural gas company: "[W]hile 'antitrust considerations' are relevant to the issue of 'public interest, convenience, and necessity' * * * there is no 'pervasive regulatory scheme' * * * including the antitrust laws that has been entrusted to the Commission." As stated by the Court in United States v. Radio Corp. of America, supra, 358 U.S. at 352, 79 S.Ct. at 468, with respect to the radio and television provisions of the Federal Communications Act, and speaking of a commission approved exchange of television licenses under the Commission's "public interest" standard; "But the issue in controversy before the Commission was whether the exchange would serve the public interest, not whether § 1 of the Sherman Act had been violated." See also United States v. Philadelphia Nat'l Bank, supra, 374 U.S. at 351, 83 S.Ct. 1715.

■ The provisions of the Act requiring the filing of rates and contracts with the Commission and conformity thereto until otherwise ordered · by the Commission upon complaint or on its own motion, do not involve direct rate fixing or contract prescription by the Commission. Rather, the motor carrier initially fixes his own rates and forms his own contracts subject, of course, to the supervisory powers of the Commission.

■ Although these rates and contracts become in effect the authorized, lawful and presumably reasonable rates and contracts of the motor carrier, this legality pertains only to the relationship between the motor carrier and the shipping public and the purposes of the declared national transportation policy.

■ It has been held repeatedly that the mere fact of such authorization of rates or contracts or other conduct by a regulatory agency does not necessarily obviate the possibility that such rates, contracts or conduct, although authorized for one purpose, may be used for another unlawful purpose. In State of Georgia v. Pennsylvania R. R. Co., supra, 324 U.S. at 457, 65 S.Ct. at 726, the Court, speaking of the regulatory scheme of the Interstate Commerce Act in a case alleging an unlawful combination of carriers to fix their rates in violation of the Sherman Act, said "But it would be a perversion of those sections to hold that they legalize a rate fixing combination of the character alleged to exist here."

■ Similarly, in the early case of United States v. Pacific & Arctic Ry. & Nav. Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742 (1913) the Court held that, whatever may be the right of a carrier to select its connections, an indictment charging that agreements were entered by steamship carriers (then subject to the Interstate Commerce Act), not for natural trade reasons or reasons of efficiency but for the purpose of restraint of trade and monopolization, charged a violation of the antitrust laws over which the courts have cognizance with power of decision upon the principle that the plan makes the parts unlawful whatever they may be independently of it, citing Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). See also, United States v. Borden Co., supra, 308 U.S. at 204–205, 60 S.Ct. 182; American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Atchison, Topeka & Santa Fe Ry. Co. v. Aircoach Transp. Ass'n, 102 U.S.App. D.C. 355, 253 F.2d 877, 887 (1958); Slick Airways v. American Airlines, 107 F.Supp. 199 (D.N.J.1952). The Interstate Commerce Act does not contemplate restraint of trade or monopoly in the transportation industry. On the contrary the Act contemplates competition between carriers except only within the

limits of the specific exemptive powers entrusted to the Commission for the purpose of avoiding "destructive competition."

Finally, on the negative side, it is noted that except for the express antitrust exemptive provisions already noted, there is no provision of the Interstate Commerce Act requiring the Commission to deal with or consider antitrust conduct, nor does the Act empower the Commission to grant plaintiff herein, and others similarly situated, relief from the alleged antitrust conduct either by issuance of cease and desist orders as to future conduct or by damages as to past conduct.

From the foregoing summary analysis of the Interstate Commerce Act, considered in the light of the foregoing cases the Court concludes that there is no "plain repugnance" between the Interstate Commerce Act and the antitrust laws as they apply to the conduct alleged in the complaint; that the regulatory scheme of the Interstate Commerce Act is not "all pervasive" in the sense that it impliedly excludes judicial enforcement of the antitrust laws against motor carriers and, further, that the Interstate Commerce Commission is not empowered to deal with the "essential ingredients" of the antitrust monopolization conduct alleged against defendants.

In Pan American World Airways, Inc. v. United States, supra, heavily relied on by defendants, the United States brought suit for injunctive relief against Pan American, W. R. Grace & Co., and Panagra (who were subject to regulation under the Federal Aviation Act) alleging violations of the Sherman Act. The suit charged that Pan American and Grace, each of whom owned 50% of the stock of Panagra, formed the latter under an agreement that Panagra would have the exclusive right to traffic along the west coast of South America free from Pan American competition and that Pan American was to be free from competition of Panagra in other areas in South America and between the Canal Zone and the United States. In addition, the suit charged that Pan American and Grace conspired to monopolize and did monopolize air commerce between the eastern coastal areas of the United States and western coastal areas of South America and Buenos Aires. Pan American was also charged with using its 50% control over Panagra to prevent it from securing authority from the Civil Aeronautics Board to extend its route from the Canal Zone to the United States.

The District Court found that Pan American had violated § 2 of the Sherman Act by suppressing Panagra's efforts to extend its route from the Canal Zone to the United States by blocking Panagra's application to the Civil Aeronautics Board for a certificate for operation north of the Canal Zone and indicated that Pan American should divest itself of Panagra stock.

On appeal from this judgment the Supreme Court reversed and held that the narrow issues presented by the complaint (i. e., whether the alleged antitrust conduct should cease for the future and be undone by an order of divestiture as to the past) were the "precise ingredients of the [Civil Aeronautics] Board's authority" under § 411 (of the Federal Aviation Act) concerning injunctive relief against "allocations of routes or combinations by air carriers" citing Texas & Pac. R. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907) and Keogh v. Chicago & No. W. Ry. Co., supra; Pan American World Airways, Inc. v. United States, supra, 371 U.S. at 305, 310, 83 S.Ct. 476.

The Court pointed out that air carriers conducted their business under a regulated system of limited competition and that under § 411 the Board had been expressly granted authority to issue "cease and desist" orders with respect to "unfair methods of competition" and that this power should be construed as broad enough to include an order of divestiture.

The Court distinguished State of Georgia v. Pennsylvania R. R. Co., supra,

where a conspiracy among railway carriers to fix rates was held cognizable under the antitrust laws, upon the ground that the Interstate Commerce Commission at the time of *Georgia* did not have power to grant relief, noting, however, that the result in *Georgia* might now be different in view of the 1948 Reed-Bulwinkle Act amendment (Sec. 5b of the Interstate Commerce Act) giving express authority to the Interstate Commerce Commission to approve and exempt from the antitrust laws, rate combinations of the kind involved in that case.

The Court in *Pan American* was careful to disclaim any intention of holding that the regulatory scheme of the Act was designed to impliedly displace the antitrust laws—absent an unequivocally declared congressional purpose to do so, stating at 305, 83 S.Ct. at 482: "While the Board is empowered to deal with numerous aspects of what are normally thought of as antitrust problems, those expressly entrusted to it encompass only a fraction of the total. * * * [T]he whole criminal law enforcement problem remains unaffected by the Act. * * * Moreover, on the civil side violations of antitrust laws other than those enumerated in the Act might be imagined. We, therefore, refuse to hold that there are no antitrust violations left to the Department of Justice to enforce."

More specifically, the Court pointed out at 311–312, 83 S.Ct. at 486 that the Board had no power to award damages or to bring criminal prosecutions, "Nor does it, as already noted", said the Court, "have jurisdiction over every antitrust violation by air carriers", adding that only "where the problem lies within the purview of the Board, as do questions of division of territories, the allocation of routes and the affiliation of common carriers with air carriers, Congress must have intended to give it authority that was ample to deal with the evil at hand."

This Court is of the opinion that *Pan American* does not support defendants in this case because, as already noted, the Interstate Commerce Commission has not been empowered (as was the Civil Aeronautics Board under § 411 of the Federal Aviation Act) to deal with the "precise ingredients" of the conduct alleged in the present complaint—monopolization, attempted and achieved, either by cease and desist order or by an award of damages therefor.

In *Keogh*, also heavily relied on by defendants, a shipper brought an action under the Sherman Antitrust Act alleging a combination by eight different railroad companies and others to fix freight rates and claiming damages to the extent of the difference between the alleged arbitrary and unreasonable fixed rates and the rates paid prior to the imposition of the fixed rates.

The rates in question had been filed by the carriers with the Interstate Commerce Commission but were suspended by the Commission pending investigation upon complaint by *Keogh*. After extensive hearings in which *Keogh* participated, the Commission approved the rates and they were, thereafter, put into effect by the defendant railroad companies.

The Supreme Court stated that under the Sherman Antitrust Act, a combination of carriers to fix rates, regardless of whether they are filed and approved by the Commission, may be illegal, and, if so, the Government may have redress by criminal proceedings under § 3 of the Act, by injunction under § 4, and by forfeiture under § 6, stating at 162 of 260 U.S. at 49 of 43 S.Ct.:

"The fact that these rates had been approved by the Commission would not, it seems, bar proceedings by the Government. It does not, however, follow that Keogh, a private shipper, may recover damages under section 7 because he lost the benefit of rates still lower, which, but for the conspiracy, he would have enjoyed. There are several reasons why he cannot."

The Court reasoned that the plaintiff, a shipper, could not bring a suit for damages under the Sherman Act for the stated reason that Congress in enacting the Interstate Commerce Act intended that "the legal rights of a shipper as

against [a] carrier in respect to a rate are measured by the published tariff;" that such rate, until suspended or set aside, became for all purposes "the legal rate, as between carrier and shipper" and could not be varied or enlarged either by the contract or tort of the carrier; that, therefore, plaintiff would not be able to prove damages. Furthermore, the Court pointed out, the paramount purpose of Congress in enacting the Interstate Commerce Act—prevention of unjust discrimination—might be defeated, because a damage suit under the Sherman Act might result, like a rebate, in a preference over trade competitors and thus set at naught the very purpose of the Act. See also T. I. M. E. Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1958).

In the opinion of this Court *Keogh* does not support defendants in the pending case. The Court in *Keogh* expressly recognized that a rate combination of regulated carriers might be illegal and subject to attack under the antitrust laws even though the rates were authorized by the Commission. It merely held that an antitrust suit by a shipper to recover damages—the difference between the rates as filed and approved and the allegedly reasonable rates which the shipper would otherwise have enjoyed—would not lie because adjudication of such an issue under the antitrust laws would collide with the provisions of the Interstate Commerce Act empowering the Commission to determine the reasonable and presumably lawful rates which carriers must charge to all shippers alike and, further, if allowed, might result in a discriminatory rebate contrary to the declared policy of the Act.

 In the pending case the plaintiff is not a shipper but a motor carrier competitor. Further, this competitor is not seeking such damages as were sought in *Keogh* nor does plaintiff allege or contend that any particular rate maintained by defendants was unlawful, unreasonable or discriminatory as between defendants and their customers. The competitor merely alleges and contends that certain otherwise lawful rates maintained by defendants were used by defendants as one means, among other means, of furthering an alleged unlawful purpose—monopolization of a certain market of the motor carrier business in violation of the Sherman Act. Any damages would be measured, not by the difference between the filed, lawful rate and some other rate, but by the pecuniary loss sustained by plaintiff in its business as a result of defendants' alleged monopolization. Such damages are provable and could not possibly amount to a discriminatory rebate to any shipper or create any repugnancy between the Interstate Commerce Act and the antitrust laws.

*Keogh* was cited and followed in State of Georgia v. Pennsylvania R. R. Co., supra, to the extent that *Georgia* held upon its authority that plaintiff, the State of Georgia, seeking both damages and injunction, could not recover damages (as distinguished from injunctive relief). It is clear, however, that *Georgia* followed *Keogh* in this respect only because it considered that the plaintiff State of Georgia, suing the railroads as "parens patriae" on behalf of the citizens of Georgia, and its economy, was in the same position as was the plaintiff, a shipper, in *Keogh*. See State of Georgia v. Pennsylvania, R. R., supra, 324 U.S. at 453, 65 S.Ct. 716.

*(2) The California Public Utilities Code vis-a-vis the Federal Antitrust Laws*

 Obviously the State of California could not validly exempt, either expressly or impliedly, from the federal antitrust laws conduct of motor carriers that would otherwise so restrain or affect interstate commerce as to violate the federal antitrust laws. U.S.Const., Art. VI.

 Defendants, however, argue that the activities alleged in the complaint have been carried on by direction of the State of California under the provisions of the California Public Utilities Code and that, therefore, the antitrust laws are inapplicable under the rule of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) that the antitrust laws

are not intended to inhibit state directed action.

In Parker v. Brown, supra, a producer and packer of raisins brought suit in the federal court to enjoin the State Director of Agriculture, Raisin Proration Zone No. 1, the members of the State Agricultural Prorate Advisory Commission and of the Program Committee for Zone No. 1, and others charged by the California Agricultural Prorate Act with the administration of the Prorate Act from enforcing, as to plaintiff, a program for marketing the 1940 crop of raisins produced in "Raisin Proration Zone No. 1."

One of plaintiff's contentions in that case was that the state agricultural proration program was in conflict with the federal antitrust laws.

The California Prorate Act provided for the organization of a prorate zone for the formation of a program initially proposed by producers but ultimately approved and enforced by the State. Under the program, restrictions are imposed on producers with respect to the terms of sale of their crops; minimum prices are prescribed and producers are directed to sell at not less than the minimum prices (sale at less than the minimum is made unlawful) and these provisions of an approved prorate program are enforcible, not only by civil injunction, but also by criminal penalties.

The Court held that the Sherman Act was intended to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations; that it was not intended to restrain a state or its officers from action directed by its legislature; that, although this prorate program would violate the antitrust laws if it were organized and made effective solely by virtue of contracts, combinations or conspiracy of private persons, such is not the case; that the program does not operate by force of individual agreement or combination but derives its force from the legislative command of the state; that it is the State of California which adopts the program and enforces its minimum price provisions as sovereign with penal sanctions. The

Court pointed out, however, that a state does not give immunity to those who violate the Sherman Act merely "by authorizing them to violate it or by declaring that their action is lawful".

The question here presented is whether the alleged activities of defendants have been directed by the State of California through the Public Utilities Code.

United Parcel Service, Inc., (Ohio) operates as an intrastate "common" or "certificate" carrier between all points in the State of California. However, the operating certificate restricts such service to packages of less than 50 pounds and 108 inches in length and girth combined. Defendants also operate as an intrastate "contract" or "permit" carrier within a number of local drayage areas (e. g., San Francisco, East Bay, Los Angeles, San Diego) and between these areas.

 These intrastate operations are subject to and are regulated by the California Public Utilities Commission under provisions of the California Public Utilities Code §§ 201–2113 (Part 1 of Division 1 of the Code), 3501–3812 (Highway Carriers' Act), 3901–4149 (City Carriers' Act).

The scheme of regulation is quite similar to the provisions of the Interstate ¹ Commerce Act applicable to similar interstate operations.

With respect to intrastate "common" carrier operations, the Code provides that no highway common carrier may operate on any public highway of the State without first having obtained a certificate of public convenience and necessity. § 1063. The Commission may attach to the certificate such terms and conditions as the public convenience and necessity may require. § 1064. A certificate may be sold, leased, transferred or inherited as other property, but only upon authorization by the Commission. § 1063.

 A highway common carrier is a public utility and subject to the provisions of the Code regulating public utilities. §§ 211, 216. Accordingly, a highway common carrier must file with the

Commission a schedule showing its rates, fares, charges and classifications for the transportation of property and is prohibited from deviating therefrom. §§ 486, 494. Changes in any rate or classification, or in any rule or contract relating to or affecting any rate, requires 30 days' notice to the Commission and to the public. § 491. With respect to a schedule which does not increase or result in an increase in a rate, the proposed change goes into effect 30 days after its filing with the Commission, unless suspended by the Commission. § 455. A schedule proposing an increase in a rate requires a showing before the Commission and a finding by the Commission that the increase is justified. § 454. In this regard, defendants have from time to time, sought and received permission to increase its "common" carrier rates, but the Commission has expressly stated in its order authorizing such an increase that it does not make any finding of fact as to the reasonableness of the rate increase and further, conditioned said Order to provide that defendants will never urge before the Commission or in any other proceeding, that its order constitutes a finding of fact of the reasonableness of any particular rate or charge. See PUC decisions 47716, 49375.

The Commission is empowered to hold hearings concerning the propriety of any proposed rate, classification, contract or rule change and may suspend such proposed change for a maximum of 120 days (unless extended for an additional six months). After hearing, the Commission shall establish the rates, classifications, contracts or rules proposed, in whole or in part, or others in lieu thereof, which it finds to be just and reasonable. § 455.

■■ As a public utility, a highway common carrier is required to furnish adequate, efficient, just and reasonable service, instrumentalities, equipment and facilities, to charge "just and reasonable" rates and prohibited from granting preferential rates. §§ 451, 453. The Commission may, upon a hearing, investigate an existing rate, classification, rule, contract or practice and establish new rates, classifications, rules, contracts or practices in lieu thereof. § 729.

In 1938, pursuant to § 729 and other provisions of the Code, the California Public Utilities Commission established a statewide minimum rate tariff for the delivery of general commodities, applicable to common, contract and city carriers. Defendants, however, sought and received an exemption from the Commission from the application of that tariff with respect to their entire California operations, both common and contract. See PUC decision 31606 (12/27/38).

In the foregoing decision the Commission stated that "certain carriers [including defendants herein] rendering services of a peculiar nature were proposed to be exempted from the order herein" and that the reason for such an exemption was "That this record does not show to what extent, if at all, [their] rates, rules and regulations are unreasonable, discriminatory, unjustified by transportation conditions, or otherwise unlawful, and that, therefore, none of such rates, rules or regulations should be required to be changed or established by the order herein."

At various times the Commission, pursuant to § 729 and other provisions of the Code, has also established minimum rate tariffs for delivery of general commodities within local drayage areas, applicable to common, contract and city carriers. Defendants, however, have not been exempted from these local minimum rate tariffs with respect to their common carrier operations, although they have been exempted with respect to their contract carrier operations. See PUC decisions 28632 (3/16/36), 48369 (2/10/53) (San Francisco drayage area); 29217 (10/26/36), 48370 (2/10/53) (East Bay drayage area); 30600 (2/27/38), 30785 (4/21/38), 34042 (3/25/41) (Los Angeles drayage area); 30021 (8/9/37), 35055 (2/24/42), 55256 (7/9/57) (San Diego drayage area).

With respect to intrastate "contract" carrier operations, the Code provides that all highway contract carriers must first

obtain a permit from the Commission. § 3571.

The Commission may attach to the permit such terms and conditions as in its judgment are required to assure protection to persons utilizing the operations. § 3572. A permit cannot be sold, leased, assigned, transferred or otherwise encumbered without first having secured from the Commission an order authorizing it. § 3574.

■ The Code provides that highway contract carriers are subject to the provisions of the Highway Carriers' Act [§§ 3501–3812]. § 3541. Under the Act, the Commission shall, upon complaint or on its own, establish or approve just, reasonable, and nondiscriminatory maximum or minimum or maximum and minimum rates to be charged by a highway contract carrier. § 3662. As previously mentioned, the Commission has established statewide and local minimum rates applicable to contract carriers but defendants' contract carrier operations have been exempted therefrom.

The Commission may require a contract carrier to file with it a true copy of any contract, agreement or arrangement between it and any other carrier in relation to any traffic affected by the Act. § 3702. However, defendants have informed the Court that to date they have not been required to file such contracts.

The Commission may cancel, revoke or suspend the operating permit of a highway contract carrier upon certain enumerated grounds and may upon good cause revoke, alter or amend any certificate of a highway common carrier. §§ 1070, 4112.

It is apparent that the regulatory scheme of the California Public Utilities Code is quite different from the regulatory scheme of the Prorate Act considered in Parker v. Brown, supra.

Although California's scheme of regulation for motor carriers emanates from the state as sovereign to carry out the declared purposes of the Public Utilities Code, the regulatory scheme is one of general supervision rather than one of specific direction.

Although the California Public Utilities Code requires and directs that motor carriers shall not operate without compliance with certain of its provisions (e. g., requiring an operating permit or certificate) and although it further provides and directs that motor carriers must affirmatively do other things (e. g., file rate schedules in the case of common carrier operations and refrain from charging less than the minimum rates fixed by the Commission), the Act does not otherwise affirmatively direct what the carriers' rates or contracts shall be— except that they shall be reasonable.

Just as under the Interstate Commerce Act, the motor carrier initially fixes and files his own rates (except re common carrier rate increases which must be justified and approved by the commission) and forms and files its own contracts subject, of course, to the supervisory power of the State Public Utilities Commission.

■ The mere fact that California entrusts to the Public Utilities Commission a plenary reserve power to change these rates or these contracts if it deems necessary in the public interest does not mean that the rates and contracts under which defendants have until now operated, although lawful, authorized and presumably reasonable, have been directed by the State of California in the sense considered in Parker v. Brown, supra.

To the extent that the State of California allows defendants to operate under and subject to the supervisory power of the Public Utilities Commission, the Code may be said to authorize such operations. However, such authorization is not enough to bring these operations within the rule of Parker v. Brown, supra, wherein the Court is careful to say at 351, 63 S.Ct. at 314: "True, a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." Further, defendants inform the Court that they have never been

required to change any of their filed rates or contracts and as already indicated, defendants have sought and obtained orders from the California Public Utilities Commission exempting them from any rate regulation at all in their contract carrier operations—the very kind of retail market monopoly concerning which has been alleged herein—nor have defendants ever been required to file their retail customer contracts in that market.

The Court concludes therefore, that the intrastate operations of defendants have not been directed by the state within the meaning of Parker v. Brown, supra.

 Certainly, the California Public Utilities Code could not and has not directed defendants to create or attempt to create a monopoly in violation of the federal antitrust laws nor to do any of the acts charged in the complaint as having been done with the intent to create a monopoly. As said in United States v. Borden Co., supra, 308 U.S. at 204–205, 60 S.Ct. at 191:

> "The right of these agricultural producers thus to unite in preparing for market and in marketing their products, and to make the contracts which are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise."

## THE ISSUE OF PRIMARY JURISDICTION

After the denial of its motion to dismiss, defendants moved this Court, *inter alia,* for a stay of the proceedings in order to permit the Interstate Commerce Commission and the California Public Utilities Commission to rule upon certain issues claimed to be raised by the pleadings.

Defendants state the issues which, they claim, should be so referred (Brief for Defendants in Support of Motion to Stay, pp. 6–8, May 6, 1966) as follows:

"(1) Whether UPS' rates to large retail shippers are reasonable or, as plaintiff charges, discriminatorily low.

"(2) Whether UPS' rates to all retailers are reasonable or, as plaintiff charges, 'high and arbitrary.'

"(3) Whether UPS' rates to wholesale shippers are reasonable or, as plaintiff charges, discriminatory or below cost or at an unreasonable low profit margin.

"(4) Whether any of the decisions of the Interstate Commerce Commission or the California Public Utilities Commission, which granted certificates of operating authority or permits to defendants or approved any rate tariffs or rate exemptions for UPS were, as plaintiff charges, improper.

"(5) Whether the provisions of UPS' contracts with Northern California retail stores were or are reasonable requirements for providing a transportation service under the authority and subject to the regulation of the Public Utilities Commission as well as being an integral part of the rates themselves."

Defendants then state as their item 6 as follows:

"The remaining issues concerning alleged investments and acquisitions by UPS, covenants not to compete, harassment of competitors and collective bargaining agreements are all of no real materiality to plaintiff's case, and insofar as any of them, if true, could conceivably have impeded plaintiff's competition, they could and can be considered by the Interstate Commerce Commission and the California Public Utilities Commission "

Defendants' basic argument in support of a stay pending referral of the above issues to the regulatory agencies is to the effect that, since under the regulatory acts defendants' rates and charges, contracts and motor carrier practices are subject to investigation by the regulatory agencies with respect to whether they are lawful in terms of being just, reasonable and not unduly preferential and are subject to change by said agencies in the event they are not, plaintiff's allegations raise a question of "debatable legality" of these matters which must be determined by the respective regulatory agencies with their special competence; that,

if these matters are found by the agencies to be just, reasonable· and not unduly preferential, they could not be attacked by plaintiff in this antitrust suit.

Defendants argue that denial of a stay pending referral of these issues to the Interstate Commerce Commission and the California Public Utilities Commission would "invite the very kind of conflict which necessitated a stay * * * in Carnation Co. v. Pacific Westbound Conference, supra" which held according to defendants "that where conduct of defendants was challenged as illegal under the antitrust laws and such conduct was arguably lawful under the regulatory scheme governing defendants' activities, this Court should stay the action." (Brief for Defendants in Support of Motion to Stay, p. 2, May 6, 1966).

It is true that *Carnation* did order this Court to stay an antitrust action for damages pending the final outcome of certain proceedings then pending (i. e., decided by the Commission but still on appeal to the Courts) before the Federal Maritime Commission.

Those proceedings before the Federal Maritime Commission involved the question whether earlier Commission approval (under Sec. 15 of the Shipping Act) of a certain 1952 agreement between the shippers was intended to and broad enough to cover implementation of certain questioned, subsequent rate agreements between them (the basis of the plaintiff's antitrust suit) and thus to render the latter exempt from the antitrust laws under the express exemptive provisions of Sec. 15 of the Shipping Act.

The Supreme Court, ordering a stay under these circumstances, pointed out that its earlier cases, United States Nav. Co. v. Cunard S. S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932) and Far East Conference v. United States, 342 U.S. 570, 571, 72 S.Ct. 492, 96 L.Ed. 576 (1952) merely hold that Courts must refrain from imposing antitrust sanctions for activity of "debatable legality" under a regulatory act; that the Courts should recognize the right of the regulatory agency with its specialized knowledge of the industry, to make the initial factual determination of the circumstances underlying that legal issue in order to avoid the danger of conflict between the courts and the Commission (e. g., the Federal Maritime Commission might have determined that the questioned agreements had in fact been approved by the Commission and thus expressly exempted from the antitrust laws, or might have determined that even if not previously approved, they should be approved for prospective implementation free from antitrust sanction while the courts might find that the defendants had implemented unapproved agreements).

The Court said that, upon a finding by the Commission that such an agreement had *not* been approved and would *not* be approved prospectively, an award of antitrust damages by the Court for past and completed conduct under it would certainly not interfere with any future actions of the Commission since the Commission would have no power to validate pre-approval implementation of such agreements.

The Court held that, although an antitrust suit for such past and completed conduct should not (for statute of limitations reasons) be dismissed by the Court, the Court should stay the suit pending final determination of the legality of the questioned conduct under the regulatory act, distinguishing the dismissal approved in *Far East* upon the ground that the suit there, being for injunctive relief against continuing conduct, could be reinstated at some future time—unlike a suit for damages for past unlawful antitrust conduct subject to the statute of limitations.

No such situation exists in the pending case. As we have already pointed out none of the alleged conduct of defendants herein falls within any provision of the Interstate Commerce Act under which the agency would be expressly empowered to exempt that conduct from the antitrust laws either as to the past or prospectively. We have also already explained why in our opinion the remain-

ing provisions of the Interstate Commerce Act are not such as to exempt that conduct from the antitrust laws by implication.

It follows that *Carnation* does not support defendants' motion for a stay. There is not present in this case a question of "debatable legality" in the sense in which that term was used in *Carnation*, i. e., legality in the sense that the conduct in question might be exempt from the antitrust laws by the regulatory agency under some express or plainly implied provision of the regulatory act. Defendants here speak of "debatable legality" only in the sense that certain issues raised by the pleadings, mainly rates, contracts, etc., might be "legal" insofar as the regulatory acts are concerned. It would not follow, however, from that kind of legality that the rates, contracts and practices in question would be exempt from consideration as factors of monopolization, attempted or achieved, in violation of the Sherman Act.

■ It is not essential to constitute monopoly that each or any of the acts alleged to have been done in furtherance of monopoly have been in themselves unlawful. They may have been in themselves lawful acts.

As well stated in the oft cited opinion in Swift v. United States, supra 196 U.S. at 396, 25 S.Ct. at 279: "It is suggested that the several acts charged are lawful, and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful."

■ The gist of the monopoly prohibited by the Sherman Act is the possession of monopoly power or the attempt to gain such power, in the relevant market accompanied by an intent to acquire or maintain that power as distinguished from mere unintended growth or development as a consequence of a superior product, business acumen or historic accident. See United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

We come now to the only possible ground available to defendants in support of their motion for a stay of this antitrust action pending referral of certain issues to the regulatory agencies, i. e., that referral should be ordered under the doctrine of "primary jurisdiction". The doctrine of primary jurisdiction has been either invoked or mentioned in various different situations.

It has been sometimes mentioned in connection with cases where a proceeding is initiated pursuant to statute, before an administrative agency and comes before the Court only for review of the administrative determination. Examples are People of State of California v. Federal Power Comm'n, supra; Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958); Denver Union Stock Yard Co. v. Producers Livestock Marketing Ass'n, 356 U.S. 282, 78 S.Ct. 738, 2 L.Ed. 2d 771 (1958); Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); McLean Trucking Co. v. United States, supra. Such cases do not really involve any question of primary jurisdiction because the courts in these cases are simply exercising an appellate function under a statutory scheme for direct judicial review of administrative action.

The doctrine has also been mentioned in connection with cases in which action is commenced in court for certain relief the granting of which has been exclusively entrusted by a regulatory statute to an administrative agency. Examples are Pan American World Airways, Inc. v. United States, supra; Keogh v. Chicago & No. W. Ry. Co., supra; Texas & Pacific R. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). These cases do not really involve the doctrine of primary jurisdiction. The judicial function has simply been superceded by a statutory scheme for administrative remedy—subject only to direct judicial review of the administrative ac-

tion. The first instance Court simply determines that it has no jurisdiction.

The doctrine has also been mentioned in connection with cases in which action is commenced in court upon grounds of the illegality of certain conduct under general laws, e. g., antitrust laws, but in which a regulatory act has expressly empowered an administrative agency to exempt that particular conduct from the thrust of the general law in order to subserve some supervening public interest. An example is Carnation Co. v. Pacific Westbound Conference, supra. This situation involves the doctrine only in the limited sense that the Court, although it may have jurisdiction to ultimately grant a remedy for breach of general law, stays an action pending an administrative determination of the legality or illegality of the particular conduct in terms of exemption from the general law.

■ The doctrine of primary jurisdiction is mainly intended to apply to cases in which the Court has jurisdiction to grant a remedy upon proof of the facts alleged before it, but the issues are such as also fall within the special competence —the "expertise"—of an administrative agency in some field wherein uniformity of statute policy or interpretation is desirable. In such cases the doctrine of primary jurisdiction requires that the Court should stay its proceedings pending a referral of the issues to the agency out of consideration for the agency's "primary" (but not exclusive) jurisdiction over the issues. As the Court of Appeals said in Seatrain Lines, Inc. v. Pennsylvania R. R., 207 F.2d 255, 260 (3d Cir. 1958), the doctrine has been "worked out for the better functioning of federal courts and administrative agencies in areas where both have legitimate concern."

Examples of primary jurisdiction in this latter sense are United States v. Western Pac. R. R., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) (suit by railroads against a shipper to recover the difference between the tariff rates actually paid and those allegedly due on cer-

tain Army shipments and where the Court held that the Interstate Commerce Commission should first rule on the questions of whether the higher incendiary bombs tariff rates applied to said Army shipments and, if so, whether that tariff was reasonable) and General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940) (action in assumpsit upon a written contract by shipper against railroad car leasing company wherein the Court held that the Interstate Commerce Commission should first rule on the question of whether the railroad car leasing rates under the contract were reasonable within the meaning of the Interstate Commerce Act).

■ The question presented on defendants' motion for stay is whether any of the purposes of the doctrine of primary jurisdiction would be subserved in the pending case.

In the first place it is questionable whether the Interstate Commerce Act (Part II, applicable to motor carriers) either requires or empowers the Commission to pass upon the reasonableness of past interstate motor carrier rates. A shipper has no right of recovery, either judicially or administratively, in any event for past charges at allegedly unreasonable rates. See T. I. M. E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959).

Although an administrative right of recovery against a public utility (which includes motor common carriers) for past rates found to have been unreasonable, is given by Cal.Pub.Util.Code § 734, no such right is given as to past rates of a contract carrier.

It appears, therefore, that neither the Interstate Commerce Commission nor the California Public Utilities Commission has any concern with the reasonableness of past rates of motor carriers even upon complaint of a shipper—except that the latter state agency appears to have a proper concern with past rates charged by motor common carriers to the extent of its power to order reparations.

It follows that, if a stay were granted, the only information that could fairly be requested would be that concerning the reasonableness of defendants' past intrastate motor common carrier rates. It is also questionable whether the California Public Utilities Commission would conduct an extensive investigation into such past rates on behalf a complainant who is not a shipper, but a competitor who would have no standing to recover past alleged overcharges in any event.

The most that could be done by either the California Public Utilities Commission would be to conduct hearings (either on their own motion or at the request of a party or of this court) to determine whether those past intrastate common carrier rates and practices used by defendants in their operations over a period of many years past were "just, reasonable and not unduly preferential." Such a determination would be made, not in the light of the antitrust laws, but only in the light of the transportation policies declared by the regulatory acts—the public interest in terms of motor carrier transportation.

An agency determination that such rates and practices were just, reasonable and not unduly discriminatory (and therefore lawful) according to that standard might be useful, even determinative if this was merely a suit by a shipper to recover the difference between the defendants' past established rates and some other claimed reasonable rates.

Such a determination, however, would be neither useful nor determinative upon the issue of monopoly presented in this case, i. e., whether those rates—whether lawful or not, have been used, among other things, to monopolize a market. If so used the mere lawfulness or unlawfulness of the rates for transportation purposes as between defendants and the shipping public would be immaterial.

As said by Judge Learned Hand in United States v. Aluminum Co. of America, 148 F.2d 416, 427 (2d Cir. 1945) where "Alcoa" argued as a defense to monopolization that it had not abused its power and that its charges to consumers were reasonable:

> "Having proved that 'Alcoa' had a monopoly of the domestic ingot market, the plaintiff had gone far enough; if it was an excuse, that 'Alcoa' had not abused its power, it lay upon 'Alcoa' to prove that it had not. But the whole issue is irrelevant anyway, for it is no excuse for 'monopolizing' a market that the monopoly has not been used to extract from the consumer more than a 'fair' profit." (emphasis added).

For the foregoing reasons, referral of the issue as requested by defendants for an agency determination would not materially assist the Court in disposing of this case. The cost, time and effort of such a referral would seriously attenuate the purpose of the antitrust laws under which this suit is brought. (See United States v. Philadelphia Nat'l Bank, supra 374 U.S. at 354, 83 S.Ct. 1715).

Accordingly, it is the conclusion of this Court that defendants' motion for a stay should be and hereby is denied.

■■■ Concerning defendants' motion for leave to take an interlocutory appeal as permitted by 28 U.S.C. § 1292(b) (1964) the Court concludes that defendants' motion to dismiss for lack of jurisdiction, although it may be a controlling question of law the disposition of which might materially advance the termination of the litigation, is not a question of law as to which there is substantial ground for difference of opinion. For the reasons heretofore stated, the jurisdiction of this Court to proceed with this antitrust case does not present such a "novel question" as would suggest reluctance of the Court to proceed to trial until assured its dismissal of the motion is sustained. See In re Heddendorf, 263 F.2d 887, 888 (1st Cir. 1959). See also United States v. Woodbury, 263 F.2d 784 (9th Cir. 1959).

As to defendants' motion for a stay pending referral of certain issues to the regulatory agencies the Court concludes that such motion is not a controlling question which would materially advance

415

the ultimate termination of the litigation. Since the requested findings of the regulatory agencies do not involve any question of exempting the conduct in question from the antitrust laws, they would at most be matters for trial consideration by this Court.

For these reasons defendants' motion for leave to take an interlocutory appeal should be and hereby is denied.