MT. HOOD STAGES, INC., dba Pacific
Trailways, Plaintiff-Appellee,

v.

The GREYHOUND CORPORATION and
Greyhound Lines, Inc.,
Defendants-Appellants.

No. 74–1282.

United States Court of Appeals,
Ninth Circuit.

June 9, 1977.

Rehearing and Rehearing En Banc
Denied Aug. 3, 1977.

William W. Schwarzer, San Francisco, Cal., argued, McColloch, Dezendorf, Spears & Lubersky, Portland, Or., for defendants-appellants.

Michael N. Khourie, argued, Broad, Khourie & Schulz, San Francisco, Cal., for plaintiff-appellee.

Before BROWNING and WRIGHT, Circuit Judges, and LINDBERG,* District Judge.

* Honorable William J. Lindberg, Senior United States District Judge, Western District of Washington, sitting by designation.

BROWNING, Circuit Judge:

Greyhound Corporation and Greyhound Lines, Inc., appeal from a judgment entered on a jury verdict awarding damages to Mt. Hood Stages, Inc., for injuries resulting from violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[1] We affirm.

## I.

### *Immunity*

Greyhound is the largest common carrier by bus of passengers and package express in the United States, moving more than 80 percent of this traffic in the western states and operating over routes throughout the country. Mt. Hood is one of Greyhound's small competitors, operating over routes in Oregon, Idaho, and Utah. The essence of Mt. Hood's antitrust claim is that Greyhound acquired bus companies whose routes circled those of Mt. Hood and thereafter deprived Mt. Hood of connecting or "bridge" traffic with the purpose and effect of eliminating Mt. Hood as a substantial competitor.

Greyhound does not deny the sufficiency of the evidence to establish a violation of sections 1 and 2 of the Sherman Act, assuming that statute applies. Its principal contention is that Mt. Hood bases its claim upon acquisitions approved by the Interstate Commerce Commission and implementation by Greyhound of control over the acquired companies, and that such activities are immune from antitrust attack by virtue of section 5(11) of the Interstate Commerce Act, 49 U.S.C. § 5(11), applied in light of the Supreme Court's analysis in *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

Section 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2), provides that one carrier may acquire another with Commission approval; the Commission is required to grant such approval, subject to any terms and conditions it deems reasonable, if the acquisition "will be consistent with the

1. The judgment was for $13,146,090 (after trebling) and attorneys' fees of $1,250,000, plus costs.

public interest," *id.* Section 5(11) provides that carriers participating in transactions approved by the Commission are "relieved from the operation of the antitrust laws . . . insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction."

From 1947 to 1956 Greyhound acquired eight bus companies operating in the area relevant here. Each acquisition was approved by the Commission pursuant to section 5(2). Mt. Hood opposed four of the acquisitions. It argued that if the acquisitions were approved, Mt. Hood would be encircled and Greyhound could route traffic around it, depriving the public of the most convenient service and Mt. Hood of revenues necessary to its survival. Mt. Hood's argument to the Commission thus foreshadowed its present antitrust claim.

Greyhound responded by representing to the Commission that the acquisitions "would not adversely affect connecting carriers; that arrangements with such carriers, including interchange of traffic and open gateways, would be maintained; that it was not the policy of Greyhound to route passengers over circuitous routes; that its agents were instructed to quote the direct route as well as the Greyhound route and give passengers their choice; and that Greyhound had always carried [Mt. Hood's] schedules in its folders and cooperated in every way to acquaint the public with its service and thus promote additional traffic and business for their lines." [2] Greyhound

also represented to the Commission that Greyhound would continue a joint through-bus arrangement with Mt. Hood.[3] As the Commission later found, Greyhound intended the Commission to rely upon these representations in determining whether the proposed acquisitions were in the public interest, and the Commission did in fact rely upon them in approving the acquisitions.

In 1964 Mt. Hood filed a petition with the Commission pursuant to section 5(9) of the Act, 49 U.S.C. § 5(9),[4] asking it to reopen the acquisition proceedings and enter a supplemental order requiring Greyhound to live up to its representations. The allegations in Mt. Hood's petition to the Commission were essentially the same as those Mt. Hood later made in this antitrust suit— namely, that Greyhound had cancelled the through-bus connection, had scheduled connecting service so as to preclude reasonable connections with Mt. Hood, had directed Greyhound's agents and independent joint ticket agents to send traffic by longer routes around those of Mt. Hood, and had interfered in various ways with the distribution of Mt. Hood's schedules and the quotation of Mt. Hood's rates and services, all with the intent of injuring Mt. Hood. The United States intervened in support of Mt. Hood.

After an extensive evidentiary hearing, a hearing examiner resolved all issues against Greyhound and recommended entry of the order sought by Mt. Hood. In April, 1968, the Commission issued an opinion sustaining the examiner's findings that Greyhound had made the representations alleged, that Greyhound had intended the Commission to rely on them, that the Commission had re-

---

**2.** The quotation is from the Commission's opinion in the section 5(9) proceedings, described later. *Mt. Hood Stages, Inc.,* 104 M.C.C. 449, 452 (1968).

**3.** This agreement, initiated in 1949, provided for a through-bus from San Francisco, California, to Spokane, Washington, using Mt. Hood's bridge route between Klamath Falls and Biggs, Oregon. Revenue and expenses were shared according to the miles traveled over each company's route. The arrangement shortened the San Francisco-Spokane trip by 110 miles and several hours as compared with the all-Grey-

hound route via Portland. It provided better service to travelers and was profitable for both companies.

**4.** Section 5(9) reads:

*Supplemental orders by Commission.*—The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (7) of this section, as it may deem necessary or appropriate.

lied on them in approving the acquisitions, that Greyhound had not fulfilled the representations, and that Greyhound's actions "were inspired by a desire to stifle competition" and "injure or destroy" Mt. Hood. *Mt. Hood Stages, Inc.,* 104 M.C.C. 449, 459–63 (1968). The Commission concluded that Greyhound's failure to abide by its commitment "constitutes destructive competition in contravention of the national transportation policy, is not consistent with the public interest, and provides good cause" for a supplemental order under section 5(9) of the Act. The Commission deferred entry of a supplemental order to allow voluntary negotiations between the parties. *Id.* at 462–63.

Two months later, in July, 1968, Mt. Hood filed this suit alleging violations of the antitrust laws and common law and statutory unfair competition. With respect to the antitrust violations the complaint alleged that, beginning in 1947 and continuing to the date of the complaint, Greyhound had restrained and monopolized commerce in the carriage of passengers and their luggage between points in Oregon, Idaho, and Utah by means essentially the same as those that were the subject of the Commission's proceeding; that is, the acquisition of independent bus lines with Commission consent obtained by the misrepresentations outlined by the Commission and thereafter engaging in the destructive competitive tactics found by the Commission. Greyhound sought, unsuccessfully, to eliminate these issues from the litigation on the ground that they fell within the exclusive jurisdiction of the Commission.

In the Commission proceedings, meanwhile, the efforts of the parties to agree upon an order failed. The Commission entered its own order requiring Greyhound to restore the practices and traffic patterns existing when the acquisitions at issue were authorized, and, specifically, to restore the joint through-bus service, to revise Greyhound's schedules to permit reasonable connections with Mt. Hood, to see that through routes and fares were quoted and quoted accurately, and to eliminate other destructive practices. *Greyhound Lines, Inc. v.*

*United States,* 308 F.Supp. 1033, 1037 (N.D. Ill.1970). A three-judge district court affirmed the Commission and issued its own order in similar terms. *Id.* at 1040–41. Following entry of the district court order enforcing the Commission decision, Mt. Hood amended the complaint in this antitrust proceeding to eliminate the prayer for injunctive relief.

In June, 1971, the United States and the Commission filed petitions with the district court in the enforcement proceeding, asking that Greyhound be held in contempt for failing to comply with the court's order enforcing the Commission's decision. The court found Greyhound had willfully failed to comply with portions of the order and held Greyhound in criminal and civil contempt. *United States v. Greyhound Corp.,* 363 F.Supp. 525 (N.D.Ill.1973). The court imposed fines totaling $600,000, *United States v. Greyhound Corp.,* 370 F.Supp. 881, 883–85 (N.D.Ill.1974), ordered Greyhound to file semiannual reports of compliance efforts for five years, and granted members of the Department of Justice staff "visitorial and document examination rights so that they may further monitor Greyhound's compliance efforts," *id.* at 886. Because Greyhound appeared to be attempting to comply fully, no further injunctive relief was ordered.

While the proceeding to enforce the Commission's order was in progress, this antitrust case had come to trial and concluded with the verdict in Mt. Hood's favor. The opinion of the court in the enforcement proceeding noted that "many of Greyhound's actions that were found to be in violation of the order, were also found to be in violation of the antitrust laws" in this private suit. *Id.* at 884 n. 2. The enforcement court denied Mt. Hood's prayer for damages for expenses related to the contempt action and for injury to its business as a result of the contempt, on the ground that the damages awarded in this antitrust proceeding "will adequately compensate [Mt. Hood] for any damages it may have also suffered as a result of Greyhound's contempt. This is particularly true since

many of the same acts of Greyhound that were found to be contemptuous were also involved in the private antitrust case." *Id.* at 888. The court of appeals affirmed the criminal contempt convictions, stating, "the record of this case shows a flagrant disregard of a court order" that was intended "to insure that Greyhound would comply with representations it made at the acquisition hearings and cease its predatory practices toward Mt. Hood." *United States v. Greyhound Corp.,* 508 F.2d 529, 540–41 (7th Cir. 1974).

From this recital it is evident that the conduct underlying the regulatory proceedings and that underlying the antitrust suit are essentially the same. The Commission's authority to regulate this conduct is not challenged.

█ Whether conduct Congress has made subject to administrative regulation is exempt from the antitrust laws depends upon Congress' intent. No direct evidence of a congressional intent relevant here has been cited.[5] The only applicable statutory language dealing with the question of antitrust immunity is that found in section 5(11), quoted above. The conduct charged in this action is not within the express exemption afforded by section 5(11), particularly because provisions of this kind are strictly construed.[6] Since the Commission approved the acquisitions in reliance upon Greyhound's commitment that the conduct underlying the antitrust complaint would not occur if the acquisitions were approved, it can hardly be argued that antitrust immunity for such conduct is "necessary" to enable Greyhound "to carry into effect the transaction so approved . . . and to hold, maintain, and operate any properties and exercise any control . . . acquired through such transaction."

The inclusion of this express exemption in the statute implies a congressional intention that conduct not within the exemption remains subject to the antitrust laws.[7] But this conclusion does not always follow; despite a grant of express immunity that does not cover the conduct charged, antitrust immunity may still be implied.[8]

█ Because of the "fundamental national policies embodied in the antitrust laws," *Otter Tail Power Co. v. United States,* 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973), however, repeal of those laws is not lightly implied from congressional adoption of a regulatory scheme.[9] Conduct is not immunized merely because it falls within the jurisdiction of the regulatory

---

5. The subject of antitrust immunity was touched upon briefly during the House debates. 58 Cong.Rec. 8593–94 (1919). The scope of the immunity was not discussed. Representative Sanders assured other House members that the antitrust laws were not being "wiped out"— that a merger will only be allowed if it would benefit the public. *Id.*

6. *Federal Maritime Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 733, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 316, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

7. *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 216–17, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); *United States v. Borden Co.,* 308 U.S. 188, 201, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

8. *See International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.,* 518 F.2d 913, 918–19 & n. 24 (9th Cir. 1975). *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), the decision relied upon

most heavily by Greyhound, involved an express exclusion, and it is not entirely clear that the conduct that case held to be immunized from the antitrust laws was within the express exclusion, narrowly construed. The Court suggested as much when it noted, "a statutory scheme that does not create a total exception from antitrust laws may, nonetheless, in particular and discrete instances *by implication* grant immunity from an antitrust claim." *Id.* at 385 n. 14, 93 S.Ct. at 660 (emphasis added). The Supreme Court has twice cited *Hughes Tool* as a case in which immunity was implied. *See Gordon v. New York Stock Exch., Inc.,* 422 U.S. 659, 682, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *United States v. National Ass'n of Sec. Dealers, Inc.,* 422 U.S. 694, 734–35, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

9. *United States v. National Ass'n of Sec. Dealers, Inc.,* 422 U.S. 694, 719–20, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

agency,[10] as it did in this case. Immunity is not implied merely because the applicable regulatory standard requires the agency to give weight to antitrust policy,[11] as it did in this instance.[12]

The applicable interpretative standard was restated by the Supreme Court in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 597, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976): "The Court has consistently refused to find that regulation gave rise to an implied exemption without first determining that exemption was necessary in order to make the regulatory act work, 'and even then only to the minimum extent necessary.'"[13] As the Court had written in the preceding term, "Certain axioms of construction are now clearly established. Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975).[14]

Applying these standards, we find no reason to imply immunity here. No "plain repugnancy" exists between the Interstate Commerce Act and the Sherman Act as applied to Greyhound's conduct, and it is not necessary to exempt Greyhound's conduct from antitrust restraints "to make the [Interstate Commerce Act] work." This is evident from the course taken in the administrative and judicial proceedings under both statutes. Clearly there has been no conflict between the regulatory and antitrust regimes. On the contrary, they have accommodated and supplemented each other. The policies of both have been advanced. There has been initial resort to the Commission for an application of its expertise to the factual issues relevant to whether application of the antitrust laws would be incompatible with regulatory objectives, *see Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), and the Commission has unqualifiedly indicated that it has not approved and continues to disapprove Greyhound's conduct under regulatory standards applied in the light of antitrust principles. *See Mt. Hood Stages, Inc.*, 104 M.C.C. 449, 458, 460–63 (1968) (citing *Marnell v. United Parcel Service of America, Inc.*, 260 F.Supp. 391 (N.D.Cal.1966)).

The remedies afforded under the two statutes have also meshed. The injunction issued in enforcement of the regulatory determination was not duplicated in the antitrust proceeding. In assessing the penalty for contempt for violation of that injunction, the court was careful to avoid the possibility of double damages. *See United States v. Greyhound Corp., supra*, 370 F.Supp. at 888. The losses sustained by Mt. Hood during the contempt period (approximately February 5, 1970, to March 15, 1973, *see id.* at 884 n.2) were only a small part of the total damages Mt. Hood sustained from the inception of Greyhound's wrongful conduct in 1947. The remaining damages could be and were recovered only in the antitrust action. Trebling the damages—an effective support for the competitive policy reflected in both statutes—could be and was accomplished only in the antitrust

**10.** *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596–97 n. 36, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 692, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (Stewart, J., concurring); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

**11.** *Gulf States Util. Co. v. Federal Power Comm'n*, 411 U.S. 747, 758–60, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 373, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

**12.** *Port of Portland v. United States*, 408 U.S. 811, 841, 92 S.Ct. 2513, 33 L.Ed.2d 723 (1972); *Northern Lines Merger Cases*, 396 U.S. 491, 511–16, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970); *McLean Trucking Co. v. United States*, 321 U.S. 67, 83–87, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

**13.** *Quoting Silver v. New York Stock Exch.*, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

**14.** *Quoting United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). *See International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.*, 518 F.2d 913, 918–19 (9th Cir. 1975).

proceeding. Since the transactions involved offended the policies of both statutes and those policies were advanced and not impaired by the application of both statutes, it is reasonable to assume Congress would have intended both to apply.

Greyhound leans heavily upon *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). From this decision Greyhound draws the general principle that when antitrust immunity is conferred by a statute upon participants in an acquisition approved by a regulatory agency, the immunity extends to conduct made possible by the acquisition whether or not the conduct itself was approved, at least where the agency considered the possibility such conduct might occur and retained continuing jurisdiction to regulate it in the public interest.

But antitrust exemption is implied *"only* to the *minimum* extent necessary" to make the regulatory scheme work (emphasis added). Quoting this principle, and citing *Hughes Tool* and *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), the Supreme Court recently wrote, "[W]e have implied immunity *in particular and discrete instances* to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts exercising jurisdiction under the antitrust laws." *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 734–35, 95 S.Ct. 2427, 2450, 45 L.Ed.2d 486 (1975) (emphasis added).

Greyhound's generalization may accommodate the facts of both *Hughes Tool* and the present case, but it omits the distinguishing particulars that made antitrust immunity appropriate in *Hughes Tool* and would make it inappropriate here. The crux of the distinction between the two cases is that, as the Supreme Court viewed

the record in *Hughes Tool*, the regulatory agency involved had considered the type of conduct which underlay the antitrust complaint and had approved it as in the public interest;[15] a successful antitrust suit therefore necessarily would have been repugnant to operation of the regulatory scheme. The opposite is true in this case; the Interstate Commerce Commission did not contemplate Greyhound's challenged conduct as likely to occur and thus did not approve such conduct when it approved the acquisitions.[16] The Commission also subsequently disapproved that conduct.

In *Hughes Tool* the Civil Aeronautics Board issued orders approving acquisition of control of TWA by Hughes Tool Co. The applicable statute relieved persons affected by such an order from operation of the antitrust laws so far as necessary "to do anything authorized, approved or required by such order." Section 414, Federal Aviation Act, 49 U.S.C. § 1384. The agency-authorized control later ended, and an antitrust suit was brought by TWA against Hughes Tool Co. based upon transactions between the two during the period of Hughes Tool Co.'s control. The antitrust complaint alleged, in effect, that the controlling company had exercised its control to dictate the completion of the transactions in a way that injured the controlled company.

Hughes Tool Co.'s control of TWA was acquired in two steps—an initial acquisition of 45.6 percent of TWA's stock, and a later acquisition increasing Hughes Tool Co.'s holdings to 80 percent. Both acquisitions were approved by the Board. In hearings relating to the second acquisition the Board examined the manner in which Hughes Tool Co. had exercised its *de facto* control over TWA in the earlier period, particularly with respect to the acquisition of new flight equipment, which was the subject matter of the transactions on which the antitrust suit was based. The Board conceded allegations

---

**15.** *See In re REA Express, Inc.*, 412 F.Supp. 1239, 1261 (E.D.Pa.1976); *Air Freight Haulage Co. v. Ryd-Air, Inc.*, 408 F.Supp. 446 (S.D.N.Y. 1976).

**16.** *See Scroggins v. Air Cargo, Inc.*, 534 F.2d 1124, 1131 (5th Cir. 1976).

of abuse of the kind alleged in the antitrust complaint. Nonetheless, the Board concluded that continuation and enhancement of Hughes Tool Co.'s control was in the public interest. Moreover, the Board's order required that all substantial sales transactions between the two companies be submitted to the Board for approval, and, pursuant to this requirement, the transactions upon which the antitrust complaint rested were submitted to the Board and approved as in the public interest.

The Supreme Court noted that the subject matter of the Board's approval had been the acquisition and exercise by Hughes Tool Co. of control over the same kind of transactions as those at issue. *Hughes Tool, supra,* 409 U.S. at 386, 93 S.Ct. 647. By its approval the Board had determined that such control was in the public interest and consistent with the regulatory statute's prohibitions against monopoly and restraining competition. Sections 102(c) and 408(b), Federal Aviation Act, 49 U.S.C. §§ 1302(c) and 1378(b).[17] The Court further noted that the Board had also approved the very transactions underlying the antitrust suit as meeting the same standard. 409 U.S. at 379, 387, 93 S.Ct. 647.

An antitrust suit challenging these transactions, the Court said, would seek "to negate what the Board, after full investigation, had found consistent with § 408's antimonopoly provision, consistent with § 102's competition standard, and consistent with the public interest." *Id.* at 388, 93 S.Ct. at 661. TWA's antitrust suit sought "to terminate a relationship the continuation of which the Board had found essential to both TWA and the public interest and to penalize the type of conduct which the Board expressly contemplated and preferred would continue unless and until a different order from the Board was forthcoming." *Id.*[18] The Court concluded that the transactions were exempt from suit under the Sherman Act.[19]

**17.** Acquisition of control of one company by another necessarily contemplates exercise by the parent of control over the internal business operations of the subsidiary. When the agency has approved acquisition of control, exclusive agency jurisdiction over its exercise is more readily implied. *See Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 385–86, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), *citing Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), as such a case.

**18.** *See also Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 309, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).

**19.** The Court summarized its holding in almost identical language at two points in the opinion: At pages 387–88, 93 S.Ct. at page 661, the Court said:

We repeat, however, what we said in the *Pan American* case that the Federal Aviation Act does not completely displace the antitrust laws. . . . But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where it specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws. As noted, the parent company which controls an air carrier is subject to pervasive control by the CAB. The control which the CAB is authorized to grant or to deny under § 408 involves an appraisal of the impact of that control in terms of monopoly and competition; and the ongoing supervision entrusted to the CAB by § 415 is broad enough to put all transactions between parent and subsidiary—as originally conceived or subsequently exercised—under CAB supervision.

And again at page 389, 93 S.Ct. at page 661–662:

We by no means hold that the Federal Aviation Act completely displaces the antitrust laws. *Pan American,* 371 U.S., at 305, [83 S.Ct. at 482]. But where, as here, the CAB authorizes control of an air carrier to be acquired by another person or corporation, and where the CAB specifically authorizes as in the public interest specific transactions between the parent and the subsidiary, the way in which that control is exercised in those precise situations is under the surveillance of the CAB, not in the hands of those who can invoke the sanctions of the antitrust laws. The control which the CAB is authorized to grant or to deny under § 408 involves an appraisal of the impact of that control in terms of monopoly and competition; and the ongoing supervision entrusted to the CAB by § 415 is broad enough to put all transactions between parent and subsidiary—as originally conceived or subsequently exercised—under CAB supervision.

In sum, in *Hughes Tool*, the propriety under the regulatory statute of the activity challenged in the antitrust suit (control by Hughes Tool Co. of the manner in which its TWA subsidiary acquired new aircraft) was the central issue presented to the agency for consideration in the exercise of its regulatory authority, and the agency had resolved the issue by approving such control as in the public interest. Exemption from the antitrust laws was implied because a successful application of the antitrust laws to the conduct would have negated the regulatory agency's determination and faced the regulated carrier with inconsistent governmental commands. In the present case, as has been seen, the premise of inconsistent regulatory and antitrust demands is absent. Also unlike *Hughes Tool*, the instant suit is not brought by a subsidiary against its parent and does not challenge the effect on the acquired company of the daily intercompany control that was integral to the acquisition. *See also Pan American World Airways v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). Rather, the instant suit is brought by a third party to the approved acquisitions, challenging conduct with regard to the third party that not only was not integral to the Commission's acquisition approvals but was violative of specific representations made by Greyhound at the acquisition hearings. In these circumstances, Greyhound's conduct is not immune from antitrust strictures.

**20.** *See Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 688, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

**21.** For example, Greyhound requested an instruction that since the Commission had approved the acquisitions, "the manner in which defendants have used or exercised the control of these carriers" was within the exclusive jurisdiction of the Commission, and therefore the jury "must exclude from [its] consideration all conduct by defendants involving exercise of control over the acquired bus companies." Greyhound also requested instructions referring to the specific conduct the Commission had condemned, and telling the jury that regulation of such conduct was within the exclusive jurisdiction of the Commission and could not be the basis of any findings by the jury.

## II.

### *Jury Instructions and Admission of Evidence*

Many of Greyhound's assertions of error in evidentiary rulings and instructions rest upon Greyhound's theory of antitrust immunity and fall with it.

Greyhound complains of the district court's "failure to instruct on Section 5(11)." It is not clear precisely what Greyhound has in mind. The extent to which Greyhound's conduct was exempt from the antitrust laws by the Interstate Commerce Act was a legal question, not an issue of fact for the jury.[20] The instructions proposed by Greyhound were properly rejected for this reason and because they reflected Greyhound's uncompromising position that the acquisitions approved by the Commission and all conduct involving exercise of control over the acquired carriers were exempt from the antitrust laws and were not to be considered by the jury for any purpose whatever.[21]

■ The court was required to provide the jury with standards to apply in determining whether Greyhound was liable under the antitrust laws, and it did so. The court defined the elements of monopolization, attempt to monopolize and unreasonable restraint of trade in the usual way, and Greyhound does not object to these instructions in themselves. The court also told the jury that the fact that Greyhound was reg-

In addition, Greyhound requested an instruction essentially in the words of the statute, telling the jury that the antitrust laws did not apply to the approved acquisitions "or to anything done by defendants which was necessary to hold, maintain or operate the properties or operating rights obtained in these approved transactions." Since the scope of the immunity conferred by the statute was a legal question for the court to decide, this instruction was properly refused. *See note 20, supra,* and related text. The court's decision as to the scope of the statutory immunity shaped and conditioned the court's instructions spelling out what facts the jury must find before Greyhound could be held liable.

ulated affected what activities of Greyhound were subject to the antitrust laws; that in a regulated industry the existence of monopoly power was not evidence of monopolization, but "use of monopoly power even if lawfully acquired, to foreclose or restrain competition, to gain a competitive advantage or to eliminate a competitor" was such evidence.[22] Under these instructions the jury could not base a finding of monopolization on the approved acquisitions themselves; improper use of the acquired power was required. This was at least as favorable to Greyhound as the law warranted.

. Greyhound objects to the admission of evidence regarding the administrative and related court proceedings, and to jury instructions that this evidence could· be considered "in determining the issue of Greyhound's motive, intent and purpose and reasonableness of its behavior." Greyhound objects on several grounds, but primarily on the basis of Greyhound's immunity argument, which we have rejected. Greyhound's other objections are also without merit.[23] The evidence was properly used for the purpose stated by the court.

The lengthy instructions contained two brief passages apparently inspired by *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and *California Motor Transport Co. v. Trucking Un-*

*limited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Greyhound argues that these passages permitted imposition of liability if the jury found no more than that Greyhound had perpetrated a fraud on the Commission or had acted in bad faith in the administrative and related judicial processes, rendering those processes ineffective. Even considered alone, however, both passages also required the jury to find, as a condition of liability, that the fraud or abuse of process resulted in an administrative order that conferred a monopoly or an unreasonable competitive advantage upon Greyhound. At most, therefore, the only question raised by these passages is whether the doctrine of *Walker Process* applies outside the patent field.

When the passages are read in light of the parties' contentions, the evidence in the case, and the instructions as a whole, however, we do not believe they present even this issue. Mt. Hood did not contend that the acquisitions themselves or the power Greyhound gained through them, standing alone, constituted a violation of the antitrust laws. Mt. Hood relied instead upon Greyhound's exclusionary practices made possible by the acquisitions. The instructions were generally to. the same effect. The jury was not instructed on any theory that Greyhound's purchase of other carriers might constitute the unlawful acquisition of monopoly power. On the contrary, as we have seen, the jury was told that in such a

**22.** The quoted portion of the instruction is settled law. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Indeed, section 2 is violated if exclusionary tactics are used to maintain a lawfully acquired monopoly. *Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1344–45 (9th Cir. 1970), *interpreting United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 343 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). *See also TV Signal Co. v. American Tel. & Tel. Co.,* 462 F.2d 1256, 1261 (8th Cir. 1972).

**23.** One of these additional grounds of objection warrants brief comment. Greyhound argues that the instructions permitting use of evidence of the administrative proceedings in determining Greyhound's intent and the reasonableness

of its conduct "infringe" Greyhound's constitutional privilege to seek relief before administrative agencies, *citing Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). But "[i]t is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 514, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972). The antitrust laws have been applied in many factual contexts that included utilization of administrative processes by the antitrust violator. *See, e. g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Aloha Airlines, Inc. v. Hawaiian Airlines, Inc.,* 489 F.2d 203 (9th Cir. 1973).

regulated industry the mere possession of monopoly power did not violate the Sherman Act, and that abuse of monopoly power to eliminate competition was required. The only fraud or abuse of process presented by the evidence was that Greyhound represented to the Commission that it was not using and would not use any of the acquired routes to engage in the predatory practices we have outlined earlier, and that Greyhound nonetheless did so. Since these same predatory practices underlay Mt. Hood's antitrust claim, since the instructions also conditioned liability upon a finding of monopolization or unreasonable restraint of competition defined in the usual way, and since the judge properly ruled without submitting the issue to the jury that Greyhound's challenged conduct was not immunized from antitrust attack, the passages amounted to no more than a reiteration in another form of the general instruction that unreasonable restraint of competition or use by Greyhound of monopoly power to foreclose or restrain competition would violate the antitrust laws.[24]

Greyhound attacks the use made at trial of two antitrust consent decrees entered into by Greyhound and the United States. The decrees, which were admitted in evidence, prohibited Greyhound from refusing to establish through-routes with competitors and from continuing other practices the same as or similar to those charged in this suit. The jury was told it could consider the decrees and Greyhound's conduct with respect to obeying or disobeying them in determining the issues of Greyhound's intent and purpose and the reasonableness of Greyhound's behavior.

A trial judge must be accorded "wide latitude" in determining the relevance of evidence in antitrust cases. *Gray v. Shell Oil Co.*, 469 F.2d 742, 751 (9th Cir. 1972). The admissibility of a consent de-

cree is a matter committed to the court's discretion. *See Control Data Corp. v. IBM Corp.*, 421 F.2d 323, 326 (8th Cir. 1970). *See also Vitagraph, Inc. v. Perelman,* 95 F.2d 142, 146 (3d Cir. 1938). There was no abuse of discretion here. The court warned the jury of the limitations implicit in decrees entered into by consent, and confined their use to a proper purpose.

Greyhound's claim that the jury should not have been asked to determine whether Greyhound had a dominant share of the market because Greyhound's market share resulted from ICC-approved transactions is but another reflection of Greyhound's rejected theory of immunity.

Other objections to the instructions regarding the relevant market are without merit. While it is true that the court did not refer to the "interchangeability of services" in those terms, the court accomplished the same purpose by use of illustrations and by instructing the jury that a "relevant" market must be one for a "distinct service" with "peculiar characteristics," serving "distinctive purposes," with "dissimilar" price characteristics, and relatively "insensitive to price variations," so that an increase in bus fares would not result in large numbers of customers switching to other forms of intercity transportation. If these indices of distinctness were not found, the jury was told, intercity bus transportation would not constitute a relevant market for antitrust purposes.[25]

## III.

### Statute of Limitations

The jury awarded Mt. Hood damages for injuries sustained from 1953 to 1973. The applicable statute of limitations, 15 U.S.C. § 15b, bars all claims on which suit is not commenced within four years after they accrue—in this case, all claims that accrued

---

24. Thus even if appellant was entitled to an instruction that "fraud" must be proven by "clear and convincing" evidence, as Greyhound urges, failure to give it was harmless under Fed.R.Civ.P. 61.

25. Greyhound contends the jury was instructed as to several contentions for which there was

no evidentiary support. We have examined the record with respect to each of these issues and conclude that either there was sufficient evidence to justify an instruction or the instruction was harmless under Fed.R.Civ.P. 61.

before July 5, 1964, since Mt. Hood's suit was filed on July 5, 1968. However, Mt. Hood asserts that the running of the limitations period was suspended from 1953 to 1960 by Greyhound's fraudulent concealment of its wrongdoing, and from 1964 to the date of suit by the intervention and participation of the United States in the section 5(9) proceedings brought by Mt. Hood before the Commission.[26]

■ In accordance with the universal rule, our circuit holds that fraudulent concealment of the existence of an antitrust cause of action tolls the four-year statute of limitations provided by section 15b.[27] The jury found Greyhound had fraudulently concealed its antitrust violations from 1953 to December 14, 1960, and that Mt. Hood neither knew nor should have known of these violations prior to December 14, 1960.

Greyhound does not deny the sufficiency of the evidence to show it attempted to conceal its conduct. It argues, however, that Mt. Hood had notice of Greyhound's activities long before December 14, 1960.

The record shows that Mt. Hood complained about quoting and routing practices of Greyhound agents on various occasions during the 1953–1960 period. The record also shows, however, that Greyhound continuously represented to Mt. Hood and to the Commission that these were isolated incidents not countenanced by Greyhound's management.[28]

The record shows that Mt. Hood suspected Greyhound of unlawful conduct prior to December 14, 1960, but "[s]uspicion will not substitute for knowledge of facts from which fraud could reasonably be inferred." *Friedman v. Meyers,* 482 F.2d 435, 439 (2d Cir. 1973).

There was evidence that Mt. Hood's president expressed concern over Greyhound's expansion by acquiring other carriers, and that he also stated his belief that the consent decrees were being violated. Awareness of Greyhound's growing dominance of the market was not equivalent to notice of monopolization, however, for the acquisitions were approved by the Commission and presumably immunized from the antitrust laws. Nor was knowledge of violations of the consent decrees equivalent to such notice, for, as Greyhound itself is careful to point out, violations of consent decrees are not in themselves violations of the antitrust laws.

Greyhound asserts that Mt. Hood was charged with the duty to investigate once it became aware of facts from which antitrust violations should reasonably have been inferred.[29] But in the face of Greyhound's assurances and denials of responsibility, we cannot say as a matter of law that Mt. Hood's awareness of the growth of Greyhound's power through acquisitions and of the commission of predatory acts by some of Greyhound's agents amounted to notice

26. *See* note 4, *supra,* and related text. The period of fraudulent concealment and the government intervention tolling period can be "tacked" or "bridged" to suspend the statute for the entire period since the time between the two did not exceed four years, albeit short by only a day. *See, e. g., City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 460–61 (2d Cir. 1974); *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561, 567–72 (10th Cir. 1962); *Maricopa County v. American Pipe & Constr. Co.,* 303 F.Supp. 77, 84–86 (D.Ariz.1969), *aff'd,* 431 F.2d 1145 (9th Cir. 1970).

27. *Westinghouse Elec. Corp. v. Pacific Gas & Elec. Co.,* 326 F.2d 575 (9th Cir. 1964); *accord, Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.,* 546 F.2d 570 (4th Cir. 1976); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389 (6th Cir. 1975); *City of Detroit v. Grinnell*

*Corp.,* 495 F.2d 448 (2d Cir. 1974); *Crummer Co. v. Du Pont,* 255 F.2d 425 (5th Cir. 1958).

28. Greyhound argues that such representations, denials, and other attempts at concealment are immaterial, citing such cases as *Foster & Kleiser Co. v. Special Site Sign Co.,* 85 F.2d 742, 752 (9th Cir. 1936); *Feak v. Marion Steam Shovel Co.,* 84 F.2d 670, 673 (9th Cir. 1936). But as these cases demonstrate, attempts at concealment lose their relevance only when they occur after plaintiff already knew or should have known of the unlawful conduct. In the present case the jury weighed the evidence and concluded that, in part because of Greyhound's attempts at concealment, Mt. Hood neither knew or should have known of Greyhound's antitrust violation.

29. *See* note 28, *supra,* and cases cited therein.

of potential antitrust claims against Greyhound.

We conclude, therefore, that the trial court properly refused to set aside the jury's determination that Greyhound fraudulently concealed its antitrust violation, and that Mt. Hood had neither actual nor constructive knowledge of the violation until December 14, 1960.

■ Four years later, on December 14, 1964, one day before Mt. Hood's antitrust claim would have been barred, the United States intervened in the section 5(9) proceedings Mt. Hood had instituted before the Commission in October, 1964. The trial court held that, under the provisions of 15 U.S.C. § 16(i), the intervention and the subsequent participation by the United States in the Commission proceedings tolled the running of the statute of limitations until those proceedings terminated in 1974, well after the filing of the present suit.

Section 16(i) provides that running of the limitations period on a private cause of action is suspended during the pendency of "any civil or criminal proceeding . . . instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws."[30] Greyhound argues that section 16(i) is inapplicable because the administrative proceedings were not "instituted by the United States" and because they were not proceedings "to prevent, restrain, or punish violations of any of the antitrust laws."

The literal wording of section 16(i) is not controlling. Where one possible interpretation of the language would effect the congressional purpose and another defeat it, the former is to be adopted. *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 321, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). The clearly expressed purpose of section 16(i) is to further effective enforcement of the antitrust laws by permitting private litigants to have the benefits that may flow from governmental antitrust enforcement efforts. *Id.* at 320, 85 S.Ct. 1473. This purpose would be served by interpreting section 16(i) to encompass the government's intervention and participation in the section 5(9) proceedings before the Commission—a reading the language readily permits.

The proceedings were of a kind likely to produce benefits to Mt. Hood as a plaintiff in a subsequent antitrust suit.[31] The issues, as we have seen, were largely the same. Governmental investigative and legal resources were made available to fully develop the facts and the law favorable to the common position of the government and Mt. Hood on these issues. The successful resolution of these issues was critical to the defeat of Greyhound's claim of antitrust immunity.

It would make form controlling to hold section 16(i) inapplicable merely because Mt. Hood rather than the United States instituted the proceedings. The United

---

**30.** 15 U.S.C. § 16(i) reads in part:

Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be *suspended during the pendency* thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.

**31.** The question is not whether the government proceedings actually conferred benefits upon the private antitrust plaintiff, but whether the character of the proceedings was such that they were likely to do so. Thus in analyzing the issue the Supreme Court spoke of government action which "may aid the private litigant." *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.,* 381 U.S. 311, 319, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). If actual benefit were the test, it might be impossible to determine whether the government proceedings would toll the running of limitations until those proceedings were finally concluded. Private plaintiffs would be compelled to file their antitrust suits although government proceedings involving the same subject matter were still in progress.

States intervened little more than 60 days after the filing of Mt. Hood's petition and participated actively in all subsequent stages of proceedings that required nearly a decade to complete. Nothing would be gained, and a good deal of judicial and administrative time and efficiency would be lost, if the United States were compelled to institute a separate independent proceeding in district court under 15 U.S.C. § 26 to assure private treble damage litigants the benefits Congress intended they should have from the government's action. As the trial court concluded, "the Congressional intent behind [16(i)] is better served by treating intervention by Antitrust Division lawyers as the functional equivalent of a direct action by them."

In addition to relying on the language of the statute, Greyhound argues that section 16(i) applies only when the United States initiates rather than intervenes in a proceeding because of the Supreme Court's statement in *Minnesota Mining* that the purpose of section 16(i) is to permit private parties the benefit of *"prior government actions."* 381 U.S. at 320, 85 S.Ct. 1473 (emphasis by Greyhound). Obviously, the Court was referring only to actions occurring before the antitrust suit was commenced. Greyhound's argument epitomizes the kind of "grudging interpretation" which "would collide head-on with Congress' basic policy objectives." *Id.*

When the substance of the government's intervention and participation before the Commission is examined, it falls fairly within the class of proceedings "to prevent, restrain, or punish violations of any of the antitrust laws" to which section 16(i) applies. It is not controlling that the government's action was taken in an administrative rather than judicial setting, *Minnesota Mining, supra,* 381 U.S. at 320, 85 S.Ct. 1473, nor that the proceedings were not brought under the antitrust laws, *Luria Steel & Trading Corp. v. Ogden Corp.,* 484 F.2d 1016, 1020–21 (3d Cir. 1973); *Rader v. Balfour,* 440 F.2d 469, 473 (7th Cir. 1971). The government action suspends the running of the limitation period under section 16(i) if it "is directed at alleged conduct which appears to involve an existing or incipient violation of the antitrust laws," *Rader v. Balfour, supra,* 440 F.2d at 473, for it is government participation in such a proceeding that is likely to produce the benefits that Congress intended plaintiffs in later private treble damage actions to have.

The government's petition to intervene demonstrates that its interest lay in the possibility of antitrust violations should Mt. Hood's allegations prove correct. To explain its interest in the proceedings and its desire to participate as a party, the government stated:

> The allegations of the petition of Mt. Hood Stages, Inc. make a serious charge: that Greyhound has been permitted through the series of acquisitions the Commission approved in these proceedings to extend its system in all directions around Mt. Hood; that Greyhound has now begun to route around Mt. Hood over all Greyhound routes traffic which it used to interchange with Mt. Hood or handle in through buses over shorter and quicker routes and to engage in numerous other acts and practices which as they are described in Mt. Hood's petition (pp. 8–9) have in the aggregate the appearance of a studied effort to force Mt. Hood out of business. . . .

The petition noted Mt. Hood's increasing vulnerability to and dependence on Greyhound. It referred to Greyhound's "predatory conduct" and to the possibility of Mt. Hood's "extinction at the hands of an infinitely more powerful rival." The petition concluded:

> Behind the immediate issues before the Commission are further issues of applicability of the antitrust laws. The Commission's approvals of the acquisitions relieved Greyhound and its officials from accountability under these laws only to the extent necessary to put the acquisitions into effect. While actions taken to give effect to the acquisitions are completely immune, exercise of economic power the acquisitions conferred so as to isolate and destroy a competitor is not.

As Greyhound itself admitted before the district court in its motion to dismiss the complaint, a purpose of the Justice Department's intervention was "to assure the adequate consideration of antitrust issues."

Antitrust issues were an appropriate part of the proceedings. The Commission was required to consider the anticompetitive effects of the section 5(2) transactions in framing, and modifying, its order.[32] Early in the proceedings Greyhound was reminded "that the antitrust laws and the national transportation policy . . . offer certain broad guidelines to be kept in mind in determining this proceeding." *Mt. Hood Stages, Inc., supra,* 104 M.C.C. at 451. The Commission rested its decision upon the conclusion that Greyhound's conduct "constitutes destructive competition in contravention of the national transportation policy." *Id.* at 463.[33] In sustaining the Commission's order the district court wrote:

> It is inconceivable to us that Congress intended that destructive practices made possible by acquisition approvals may not be corrected by supplemental order under Section 5(9), especially in light of the ICC's duty to take the antitrust policy of the United States into account in its decision making.

*Greyhound Lines, Inc. v. United States, supra,* 308 F.Supp. at 1038.

Because Congress' purpose in enacting section 16(i) will be served by this interpretation, and because the language of the section does not bar it, we conclude that the government's intervention in the section 5(9) proceedings on December 14, 1964, tolled the running of the limitations period from that date.[34] Accordingly, Mt. Hood's antitrust complaint was timely filed.

## IV.

### Damages and Attorneys' Fees

Greyhound contends that Mt. Hood failed to offer adequate proof either that Mt. Hood was injured by Greyhound's conduct or of the amount of the damage. With respect to the fact of damage, Greyhound's claim is frivolous. The jury may infer the fact of damage if "plaintiff proves a loss, and a violation by defendant of the antitrust laws of such a nature as to be likely to cause that type of loss." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 697, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). Mt. Hood offered evidence that its bridge traffic declined sharply during the relevant period.[35] Greyhound's conduct found to violate the antitrust laws was directed at creating precisely this kind of loss.[36] There was no indication of an alternative source of loss sufficient to negate an inference that Greyhound's violation was a material cause. *Zenith Radio Corp. v. Hazeltine Research,*

---

**32.** *Port of Portland v. United States,* 408 U.S. 811, 841, 92 S.Ct. 2513, 33 L.Ed.2d 723 (1972); *Northern Lines Merger Cases,* 396 U.S. 491, 511–16, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970); *McLean Trucking Co. v. United States,* 321 U.S. 67, 83–87, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

**33.** The Commission rejected Greyhound's argument that Greyhound's practices were not in themselves unlawful on the basis of the antitrust principle that "actions which are not in themselves unlawful may be unlawful when they are part of a plan to monopolize or restrain commerce." *Mt. Hood Stages, Inc.,* 104 M.C.C. 449, 458 (1968). The Commission cited the Sherman Act case of *Marnell v. United Parcel Service of America, Inc.,* 260 F.Supp. 391 (N.D.Cal.1966).

**34.** We need not reach Mt. Hood's contention that the statute was tolled to December 14,

1960, by virtue of Mt. Hood's commencement of the section 5(9) proceedings.

**35.** Mt. Hood offered evidence, for example, that Mt. Hood's bridge traffic consisted of 25,258 passenger trips, or approximately 44 percent of the total relevant bridge traffic, in 1963 and had fallen to 930 passenger trips, or approximately three percent of the total, by 1969.

**36.** As described previously, Mt. Hood alleged and offered substantial evidence to prove that Greyhound had cancelled the north-south through-bus connection arrangement on which Mt. Hood depended for a substantial portion of its traffic, scheduled its services so as to preclude reasonable connections with Mt. Hood, directed independent and joint ticket agents to long-haul traffic around Mt. Hood, and interfered with distribution of Mt. Hood schedules.

*Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

Mt. Hood's proof of the amount of damage was less certain, and necessarily so. What Mt. Hood's business volume and profits would have been except for Greyhound's antitrust violation is inescapably uncertain. *See Flintkote Co. v. Lysfjord*, 246 F.2d 368, 391 (9th Cir. 1957). In such a case, the amount of damages may be shown "as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 249, 75 L.Ed. 544 (1931).

The premise of Mt. Hood's calculation of lost profits was that 95 percent of bus passengers would have traveled Mt. Hood's shorter bridge routes if they had had that choice. Greyhound asserts that Mt. Hood's premise "defies the record as well as common sense and is untenable," and therefore the entire calculation of damage fails. There was ample evidence from which the jury could reasonably infer that the shortest bus route is generally fastest, including studies comparing Greyhound's and Mt. Hood's schedules from 1950 to 1970 with regard to mileage and time.[37] Mt. Hood also introduced evidence from which the jury could reasonably infer that as a general rule 95 percent of bus passengers would take the fastest route when given a choice.[38] It is of course true that the evidence did not demonstrate to a certainty that 95 percent of passengers would have traveled Mt. Hood's shorter routes absent the restraints imposed by Greyhound's vio-

lation, but in the nature of the case proof to a certainty is not possible and is not required.

Greyhound challenges virtually every other facet of Mt. Hood's proof of damage. We have examined each of Greyhound's objections in light of Mt. Hood's response and the evidence in the record. No useful purpose would be served by a tedious recapitulation of these materials. We are satisfied that the evidence offered by Mt. Hood permitted the jury to make a reasonable and just inference of the amount of Mt. Hood's damage.[39]

■ We also sustain the award of attorneys' fees. Greyhound objects that the amount of the award divided by the number of hours devoted to the litigation by plaintiff's attorneys yields an exorbitant hourly rate. But as the experienced trial judge stated, "compensation at an hourly rate would be inadequate in a case of this kind," which "is, in many ways, unusual, . . . its complexity and difficulty set it apart from the common run of antitrust cases, if such a category in fact exists." The trial court based the award upon knowledge gained in four years' involvement in all aspects of the case, the evidence presented by the parties on this issue, and the factors prescribed in *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190 (9th Cir. 1964). The award represented an appropriate exercise of the district court's discretion.

Affirmed.

---

**37.** These studies were part of a larger damage study commissioned by Mt. Hood. The study was supplemented by the testimony of three expert witnesses over a two-week period. The study was based on statistical computations verified by Arthur D. Little & Co., an independent management consulting firm. Mr. Jizmagian, Arthur D. Little & Co.'s representative who supervised the study, testified that maximum use was made of all available data supplied by Greyhound, and where such data was not available every assumption and method "and every use of statistics and every use of ratios was done . . . with standard statistical techniques and there was, in my opinion, no speculative use of numbers." He concluded

that the study accurately reflected Mt. Hood's damages.

**38.** For example, Mt. Hood's damage study, *see* note 37, *supra*, included a comparison of passenger utilization of three available " 'All Greyhound' routes from Oregon and Washington points to Los Angeles," showing that more than 95 percent of the bus passengers chose the shortest of the three available routes.

**39.** This holding also encompasses the damage awards for express traffic Mt. Hood lost between 1964 and 1971, and for local traffic it lost between 1964 and 1970.